EDWARD DALY *v.* LAWRENCE F. DELPONTE,
COMMISSIONER OF MOTOR VEHICLES
(14552)

PETERS, C. J., CALLAHAN, BERDON, NORCOTT and KATZ, Js.

Argued January 13—decision released May 4, 1993

*Lawrence W. Berliner,* with whom was *Catherine E. Cushman,* for the appellant (plaintiff).

*Cornelius F. Tuohy,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (defendant).

PETERS, C. J. This appeal requires us to determine whether the commissioner of motor vehicles may direct

a licensed motor vehicle operator, because of a disability, to submit regular medical reports as a condition of continuing to hold an operator's license. The plaintiff, Edward Daly, who suffers from a seizure disorder, challenges the decision of the defendant, Lawrence DelPonte, commissioner of motor vehicles (commissioner), to condition his holding an operator's license on his compliance with reporting requirements regarding his medical status. Both the trial court and the Appellate Court upheld the commissioner's initial suspension of the plaintiff's license and the later imposition of postreinstatement medical reporting requirements.[1] See *Daly* v. *DelPonte,* 27 Conn. App. 495, 608 A.2d 93 (1992). We granted the plaintiff's petition for certification to appeal from the Appellate Court[2] and now reverse.

The following undisputed facts are relevant to this appeal. The plaintiff possesses a Connecticut motor vehicle operator's license, which he has held continuously since its first issuance in 1978. Until the action by the commissioner to suspend the plaintiff's license, the plaintiff had no record of any adverse administrative action regarding his license. Furthermore, the plaintiff has never been involved in any reported motor vehicle accident or other incident resulting either from his seizure episodes or otherwise.

---

[1] The commissioner's initial suspension of the plaintiff's license is not at issue in this appeal. See footnotes 8 and 9, infra.

[2] The order granting the plaintiff's petition limited the appeal to the following questions:

"1. Did the Appellate Court correctly conclude that the defendant had the statutory authority to impose postreinstatement medical reporting requirements on the plaintiff?

"2. Did the Appellate Court correctly conclude that the defendant's imposition of postreinstatement medical reporting requirements did not violate the plaintiff's constitutional rights to due process and equal protection of the laws?" *Daly* v. *DelPonte,* 223 Conn. 903, 610 A.2d 177 (1992).

In July, 1986, the plaintiff suffered a seizure, which resulted in altered consciousness.[3] Shortly thereafter, beginning in October, 1986, the plaintiff began treatment and supervised care under the direction of a neurologist. The plaintiff informed the neurologist of the July, 1986 seizure and also that he had had several seizure episodes during the previous two years. The neurologist prescribed the medication tegretol to control the seizures.[4] Since 1986 the plaintiff has reported regularly to the neurologist and has complied with the prescribed medication regimen to attempt to control the seizure disorder.

Despite these preventive measures, in July, 1987, the plaintiff suffered another seizure. The commissioner, who is the plaintiff's employer, thereafter required the plaintiff to submit periodic medical reports from his neurologist regarding his condition.[5] In the first report,

[3] The plaintiff's seizure episodes have been identified as grand mal seizures. During a grand mal seizure an individual may lose consciousness completely, have a significant clouding of consciousness, or lose cognitive capacities.

[4] Tegretol is the brand name of an anticonvulsant drug that appears to prevent the occurrence of grand mal seizures and other disorders. Tegretol dosages are prescribed to establish a minimum therapeutic concentration, or blood level, sufficient to control a particular patient's disorder. If a prescribed dosage is insufficient to control the disorder, and a patient experiences subsequent seizure episodes, the dosage may be increased. Physician's Desk Reference (47th Ed.) pp. 679–81.

[5] Whether the commissioner initially required the reports as a condition of employment or as a condition of licensure is not clear from the record. The plaintiff has not, however, challenged the propriety of the original requirement imposed by the commissioner that the plaintiff submit periodic reports from his neurologist to monitor the plaintiff's medical condition after his seizures.

At the time of the events underlying this appeal, the General Statutes required physicians to notify the department of health of patient medical problems that would affect a patient's operation of a motor vehicle. See General Statutes (Rev. to 1989) §§ 14-46c and 14-46e. As a result of No. 90-265 of the 1990 Public Acts, General Statutes § 14-46 now permits, but does not require, physicians and optometrists to notify the department of motor vehicles of patient medical problems that affect significantly a patient's ability safely to operate a motor vehicle.

submitted in August, 1987, the neurologist indicated that the plaintiff was taking tegretol and that his blood level testing was within the proper therapeutic range. A second report in January, 1989, again indicated that the plaintiff's blood level was within the proper therapeutic range and that he continued to comply with the prescribed medication regimen. Neither the August, 1987 nor the January, 1989 report indicated any seizure activity subsequent to the July, 1987 episode. The commissioner took no action regarding the plaintiff's status as a holder of a motor vehicle operator's license until March, 1989, when he formally placed the plaintiff on medical probation.

The plaintiff had been free of any medical difficulties for nearly two years, until May, 1989, when he suffered his most recent seizure. A subsequent report prepared by the neurologist again found that the plaintiff's blood level tests and medication compliance were proper. The neurologist issued an additional statement expressly concluding that the plaintiff was capable of regular full-time work, including required driving.

The commissioner had thus received reports of three seizure episodes of the plaintiff covering a period of thirty-three months. Concerned about the ability of the plaintiff safely to operate a motor vehicle, the commissioner forwarded the three neurological reports to the department of motor vehicles medical advisory board[6]

---

[6] The medical advisory board, established in 1981; Public Acts 1981, No. 81-461; is authorized to provide to the commissioner of motor vehicles general and specific recommendations regarding motor vehicle licensing and operation. The governing statutes are found at General Statutes (Rev. to 1989) §§ 14-46a through 14-46g. They provide in relevant part:

"Sec. 14-46b. ESTABLISHMENT OF BOARD. MEMBERSHIP. COMPENSATION. EXECUTIVE SESSION. (a) There is established within the department a motor vehicle operator's license medical advisory board which shall advise the commissioner on the medical aspects and concerns of licensing operators of motor vehicles. This board shall consist of not less than seven members nor more than fifteen members appointed by the commissioner from a list

(board) and requested the board to review the plaintiff's record. To enable the board to collect additional information regarding the plaintiff's medical status, the board recommended that the plaintiff's license be temporarily suspended. In particular, the board sought to confer with the plaintiff's neurologist in order to obtain

of nominees submitted by the Connecticut State Medical Society representing the specialties of (1) general medicine or surgery, (2) internal medicine, (3) cardiovascular medicine, (4) neurology or neurological surgery, (5) ophthalmology, (6) orthopedics and (7) psychiatry. . . ."

"Sec. 14-46c. RESPONSIBILITIES OF BOARD; RECOMMENDATIONS. The board shall have the following responsibilities: (1) To advise the commissioner on health standards relating to the safe operation of motor vehicles; (2) to recommend to the commissioner procedures and guidelines for licensing individuals with impaired health; (3) to assist in developing medically acceptable standardized report forms; (4) to recommend a training course for motor vehicle examiners on the medical aspects of operator licensure; (5) to undertake any programs and activities the commissioner may request relating to the medical aspects of motor vehicle operator licensure, and (6) to make recommendations and offer advice on individual health problem cases referred by the commissioner and to establish guidelines for dealing with such individual cases. In making such recommendations, the board may rely on medical records and reports, personally interview such individual or require a physical examination of such individual and a written medical report by a physician designated by the board who shall not be a member of the board. Such individual may obtain a medical report by a physician of his choice, licensed to practice in this state, which shall be given due consideration by the board in making any such recommendations."

"Sec. 14-46e. RECOMMENDATIONS OF BOARD TO BE ADVISORY. FAILURE TO COMPLY WITH REQUESTS OF COMMISSIONER OR BOARD. (a) The commissioner shall give due consideration to any recommendations of the board and to any reports, records or opinions submitted pursuant to sections 14-46a to 14-46g, inclusive, but such recommendations, reports, records or opinions shall be merely advisory and not binding on the commissioner.

"(b) Any person who is the subject of any inquiry under sections 14-46a to 14-46g, inclusive, who refuses to submit to a physical examination or provide other information requested by the commissioner or board shall be considered unfit to operate a motor vehicle until he complies with such request."

"Sec. 14-46g. RIGHT OF APPEAL. Any person whose operator's license has been suspended, restricted or revoked or whose application for an operator's license has been denied under sections 14-46a to 14-46f, inclusive, shall have the right of appeal under chapter 54. No person may operate a motor vehicle in violation of any suspension, restriction or revocation while this appeal is pending."

a more detailed assessment of the plaintiff's condition. Acting on this recommendation, the commissioner suspended the plaintiff's license, effective August, 1989. The notice of suspension indicated that, pursuant to General Statutes (Rev. to 1989) § 14-111 (a), the commissioner was suspending the plaintiff's license because the plaintiff's "continued operation of a motor vehicle would be dangerous to [the plaintiff] and others."[7]

The plaintiff requested an administrative hearing to contest the suspension. The hearing was held on three separate dates during the fall of 1989 and dealt with the plaintiff's challenge to the suspension then in effect. Both parties focused the presentation of their evidence at the hearing solely on the basis and details of the suspension. The board heard nothing, therefore, regarding appropriate or possible recommendations for the length of the license suspension, a basis to reinstate the license, or conditions to be placed on the license upon reinstatement.

The hearing officer filed his administrative decision on January 2, 1990. The factual findings, which recited the facts as presented above, did not address the issues of reinstatement or conditions thereon. The hearing officer found that the plaintiff was not "a proper person to hold a Connecticut operator's license" and, there-

---

[7] The commissioner issued to the plaintiff the following suspension notice, which provided in relevant part:

"Effective 08/05/89, your Connecticut driver's license is suspended.

"This suspension was ordered by the Commissioner of Motor Vehicles under Section 14-111 (a) of the Connecticut statutes as a result of a finding, after review of information regarding your medical condition, that your continued operation of a motor vehicle would be dangerous to you and others. IF YOU HAVE NOT PREVIOUSLY REQUESTED A HEARING AND WISH TO REQUEST ONE PRIOR TO IMPOSITION OF YOUR SUSPENSION YOU MAY TELEPHONE THE NUMBER BELOW. You will be afforded the opportunity to be heard.

"You must not operate a motor vehicle in Connecticut from the effective date of your suspension until you receive a restoration notice."

fore, concluded that the commissioner's suspension of the plaintiff's license had been valid. The hearing officer further determined that the suspension would remain in effect until May 4, 1990, at which time the plaintiff would be eligible for reinstatement of his license. The hearing officer also ordered, however, that upon reinstatement of the license, and as a condition of reinstatement, the plaintiff would be required to submit periodic medical reports to the commissioner. Such reports would be required every three months for three years; additional reports were to be required in the event of another seizure episode.

The plaintiff appealed from the administrative decision to the trial court and claimed, in addition to other challenges not relevant to the certified questions in this appeal, that the commissioner's decision regarding the postreinstatement reporting requirements lacked statutory or regulatory authority and that the commissioner's decision prejudiced the substantial rights afforded to him by the Connecticut constitution.[8] The trial court dismissed the plaintiff's administrative appeal, and the plaintiff appealed the judgment to the Appellate Court.

In the Appellate Court, the plaintiff reasserted his arguments that the commissioner had acted without

[8] The plaintiff also challenged the commissioner's authority to place him on medical probation in March, 1989, and the decision to suspend his license in August, 1989. The trial court determined that the commissioner's decisions were proper exercises of his statutory authority.

Furthermore, the plaintiff claimed that the hearing decision was not supported by findings of fact, and was, therefore, arbitrary, capricious and illegal. The trial court determined that "the findings of fact, the conclusion of law and the order issued by [the commissioner] here are supported by the evidence and are not unreasonable or illogical or in excess of [the commissioner's] authority."

Finally, the plaintiff claimed that illegal ex parte communications had affected the administrative hearing. The trial court did not address this claim in its decision.

statutory authority and that his decisions regarding the
initial suspension and postreinstatement requirements
had violated the state constitution. *Daly* v. *DelPonte,*
supra, 496. That court rejected both of the plaintiff's
challenges.[9] Regarding the authority of the commis-
sioner to impose postreinstatement reporting require-
ments, the court determined that the plaintiff was an
"applicant" for the purpose of General Statutes (Rev.
to 1989) § 14-36 (e)[10] because, although he was already
a license holder, the reinstatement following a suspen-
sion placed his license in the category of those issued
to "applicants." Id., 500. Because the plaintiff was,
therefore, an "applicant," the commissioner could prop-
erly impose medical reporting requirements as a con-
dition of licensing. Id., 500–501. Next, the Appellate
Court determined that the commissioner's decision sur-
vived the plaintiff's state equal protection challenge.
Reviewing the administrative action pursuant to a strict
scrutiny standard, the court concluded that the state
has a compelling interest in highway safety and that
the "reporting requirements placed on the plaintiff are
both necessary and narrowly tailored to achieve this
goal." Id., 506. The Appellate Court, accordingly,
affirmed the judgment of the trial court. Id., 508.

We granted the plaintiff's petition for certification
to appeal to determine whether the commissioner has
statutory authority to impose postreinstatement med-

---

[9] The Appellate Court also ruled against the plaintiff on other challenges
that are not relevant to the certified questions. See footnote 8. Because
at the time of appeal the suspension period had elapsed, the Appellate Court
held that questions involving the initial medical probation and suspension
decisions were moot. *Daly* v. *DelPonte,* 27 Conn. App. 495, 499, 502, 608
A.2d 93 (1992). Regarding the plaintiff's claim that the trial court had
improperly failed to consider the effect of the commissioner's illegal ex parte
communications, the Appellate Court determined that, because the plain-
tiff had not sought an articulation or otherwise met his burden to demon-
strate harmful error, it would "not presume that the trial court's judgment
was based on a misapplication of the law." Id., 508.

[10] See footnote 11, infra.

ical reporting requirements and, if so, whether his exercise of such authority in the circumstances of this case violated the plaintiff's constitutional rights. *Daly* v. *DelPonte,* 223 Conn. 903, 610 A.2d 177 (1992). Although we agree with the Appellate Court that the commissioner has statutory authority to condition a motor vehicle operator's license on the licensee's reporting his or her medical status, we determine that in this case the commissioner's exercise of that authority violated the equal protection provision of our state constitution.

I

The first question before this court is whether the commissioner has the statutory authority to direct a licensed motor vehicle operator to submit periodic medical reports as a condition of the continued possession of the license. The Appellate Court concluded that the commissioner has such authority pursuant to § 14-36 (e), which provides, in part, for the issuing of licenses.[11] The plaintiff challenges this conclusion,

---

[11] General Statutes (Rev. to 1989) § 14-36 provides in relevant part: "PERSONS WHO MAY OPERATE MOTOR VEHICLES; LICENSES; PENALTY. . . .

"(e) Before granting a license to any applicant who has not held a Connecticut motor vehicle operator's license during the preceding two years, the commissioner shall require the applicant to demonstrate personally to him, his deputy or a motor vehicle inspector or an agent of the commissioner, in such manner as the commissioner directs, that the applicant is a proper person to operate motor vehicles of the class for which he has applied, has sufficient knowledge of the mechanism of the motor vehicles to ensure their safe operation by him and his satisfactory knowledge of the laws concerning motor vehicles and rules of the road. . . . When the commissioner is satisfied as to the ability and competency of any applicant, he may issue to him a license, either unlimited or containing such limitations as the commissioner deems advisable, and specifying the class of motor vehicles which the licensee is eligible to operate. If any applicant suffers from any physical defect or from any disease which might affect the operation by him of a motor vehicle, the commissioner may require the applicant to demonstrate personally that, notwithstanding such defect or disease, he is a proper person to operate a motor vehicle, and he may further require a certificate of such applicant's condition, signed by a medical authority designated by him . . . . A license, containing such limitation as the com-

claiming that § 14-36 (e) authorizes the commissioner to place conditions only on a license issued to an applicant who does not already hold a Connecticut license.

The plaintiff makes a plausible argument that § 14-36 (e) addresses a category of new applicants that would not include a license holder such as the plaintiff. We need not, however, resolve this issue because other statutes confer on the commissioner the authority to condition continued possession and use of an already issued license.

Pursuant to its police powers, the legislature has given the commissioner of motor vehicles broad discretion to oversee and control the operation of motor vehicles generally. General Statutes (Rev. to 1989) § 14-3 directs the commissioner to "enforce the provisions of the statutes concerning motor vehicles and the operators of such vehicles." In furtherance of this authorization, General Statutes (Rev. to 1989) § 14-111 (a) provides that the commissioner superintend the use of licenses: "No provision of this chapter [Chapter 246, "Motor Vehicles"] shall be construed to prohibit the commissioner from suspending or revoking any registration or any operator's license . . . or from suspending the right of any person to operate a motor vehicle in this state . . . for any cause that [the commissioner] deems sufficient, with or without a hearing. . . ."

Because of the commissioner's authority pursuant to § 14-111, the issue in this case becomes whether the authority to suspend encompasses the authority to condition the reinstatement and subsequent holding of an already issued license. Although § 14-111 does not provide specific guidance on this issue, we conclude, for three reasons, that the commissioner has such authority.

missioner deems advisable, may be issued in any case, but nothing in this section shall be construed to prevent the commissioner from refusing a license, either limited or unlimited, to any person whom he deems incapable of safely operating a motor vehicle. . . ."

First, we have elsewhere recognized that the legislature's broad grant of power may be interpreted to include the conferral of such lesser included powers as are necessary to fulfill a legislative mandate. See *Bottone* v. *Westport*, 209 Conn. 652, 670, 553 A.2d 576 (1989). It is unlikely that the legislature would have authorized the commissioner to suspend operators' licenses without intending also to authorize him to employ alternatives short of suspension if such alternatives sufficiently serve the public interest.

Second, other statutes relating to the authority of the commissioner indicate that the legislature intended to confer upon him the authority to condition previously issued licenses. Because the legislature is always presumed to have created a harmonious and consistent body of law, we read statutes together when they relate to the same subject matter. See *Concerned Citizens of Sterling, Inc.* v. *Connecticut Siting Council*, 215 Conn. 474, 482–83, 576 A.2d 510 (1990); *Dart & Bogue Co.* v. *Slosberg*, 202 Conn. 566, 575, 522 A.2d 763 (1987). The statutory sections that provide for the medical advisory board; see footnote 6; empower the board to "advise the commissioner on the medical aspects and concerns of licensing operators of motor vehicles"; General Statutes § 14-46b (a); and instruct the board to "make recommendations and offer advice on individual health problem cases referred by the commissioner and to establish guidelines for dealing with such individual cases." General Statutes § 14-46c (6). In a similar vein, General Statutes § 14-46g provides that "[a]ny person whose operator's license has been suspended, restricted or revoked or whose application for an operator's license has been denied under sections 14-46a to 14-46f, inclusive, shall have the right of appeal . . . ." These sections elucidate that the legislature intended to authorize the commissioner to address

"individual cases," which, in light of the variety of recommendations that may issue from the board, will not all require complete license suspension.

In addition, the legislature's recent amendment to a related motor vehicle statute confirms the legislature's intent to confer such authority on the commissioner. We have recognized that a subsequent amendment to an existing statute may clarify the legislature's original intent. See *Darak* v. *Darak,* 210 Conn. 462, 471, 556 A.2d 145 (1989). Regarding the motor vehicle statutes, the legislature amended § 14-36 (e) in 1990 to give the commissioner extensive authority to regulate the status of licenses. See Public Acts 1990, No. 90-265, § 1.

We note, finally, that a construction of the motor vehicle statutes permitting licenses to be restricted rather than suspended is in the best interests of licensed motor vehicle operators. Operators benefit by being able to retain and make use of a license, even with reporting conditions, rather than having to forfeit all use of a motor vehicle, a loss that would be particularly onerous in a society dependent on automotive transportation. It is, therefore, altogether reasonable for the legislature to allow the commissioner to make such determinations.

We conclude, therefore, that the commissioner has the statutory authority to take measures, other than suspension, to supervise the use of licenses. This power includes the authority to impose postreinstatement medical reporting requirements.

II

The decision that the commissioner has the statutory authority to impose postreinstatement medical reporting requirements on the plaintiff does not end our inquiry. We must also decide whether the manner in which the commissioner exercised his authority com-

ports with the requirements of our state constitution. The plaintiff claims that the commissioner's imposition of postreinstatement medical reporting requirements in the circumstances of this case violated the state constitution's equal protection and due process clauses. We agree with the plaintiff that his right to equal protection was violated.[12]

### A

Before addressing the merits of the plaintiff's claim, we must determine the standard of review by which his claim is to be governed. The Appellate Court concluded that the commissioner's action must be subjected to strict constitutional scrutiny. *Daly* v. *DelPonte,* supra, 27 Conn. App. 504. We agree.

It is undisputed that the commissioner's decision to place conditions on the plaintiff's license was based on the plaintiff's status as an individual who suffers from a medical disability. Our state constitution provides that "[n]o person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." Conn. Const., amend. XXI.

Although this court has not previously decided what level of judicial scrutiny is appropriate for a claimed violation of amendment twenty-one, there are a number of relevant guideposts in our past decisions. In the

---

[12] The second certified question asked this court to review the plaintiff's constitutional claim pursuant to both the equal protection and due process clauses. See footnote 2. Because we determine that the commissioner's actions ran afoul of the equal protection clause, and, therefore, that the postreinstatement reporting requirements cannot stand, we need not address the plaintiff's due process claim. See *Negron* v. *Warden,* 180 Conn. 153, 166, 429 A.2d 841 (1980) ("[w]e thus follow the recognized policy of self-restraint and the basic judicial duty to eschew unnecessary determinations of constitutional questions").

interpretation of our state constitution, we have often consulted the case law under the federal constitution;[13] see *Plourde* v. *Liburdi,* 207 Conn. 412, 418, 540 A.2d 1054 (1988); which affords varying levels of review to equal protection claims depending upon the classes of persons protected thereby. See, e.g., *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U.S. 432, 446, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (classifications based on physical or mental disability subject to rational basis scrutiny); *Palmore* v. *Sidoti,* 466 U.S. 429, 433–34, 104 S. Ct. 1879, 80 L. Ed. 2d 421 (1984) (classifications based on race subject to strict scrutiny); *Craig* v. *Boren,* 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976), reh. denied, 429 U.S. 1124, 97 S. Ct. 1161, 51 L. Ed. 2d 574 (1977) (classifications based on gender subject to intermediate scrutiny). We have held, in accordance with the federal frame of analysis, that state action concerning social and economic regulation will survive an equal protection challenge if it satisfies a rational basis test. See *Laden* v. *Warden,* 169 Conn. 540, 542–43, 363 A.2d 1063 (1975). If, however, state action invidiously discriminates against a suspect class or affects a fundamental right, the action passes constitutional muster under the state constitution only if it survives strict scrutiny. See id., 542. In appropriate circumstances, we have interpreted the equal protection provisions of the state constitution differently than that contained in the federal constitution, particularly when the distinctive language of our constitution calls for an independent construction. See *Horton* v. *Meskill,* 172 Conn. 615, 641–45, 376 A.2d 359 (1977).

Turning to amendment twenty-one, we conclude that its explicit prohibition of discrimination because of

---

[13] The equal protection clause of the federal constitution provides, in relevant part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV.

physical disability defines a constitutionally protected class of persons whose rights are protected by requiring encroachments on these rights to pass a strict scrutiny test.[14] See generally R. Berdon, "Connecticut Equal Protection Clause: Requirement of Strict Scrutiny When Classifications are Based Upon Sex, Physical Disability or Mental Disability," 64 Conn. B.J. 386 (1990). This conclusion follows from the language of the clause itself: "No person shall be denied the equal protection of the law . . . because of . . . physical or mental disability." In other contexts, we have held that a statutory prohibition of discrimination against designated classes of individuals makes any such discriminatory conduct 'suspect.' " See *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* 176 Conn. 88, 95, 405 A.2d 618 (1978). A constitutional provision to outlaw discrimination cannot be given a lesser effect.

Our conclusion is supported by the legislative history of the constitutional amendment. Senator Howard T. Owens, Jr., stated, during Senate debates about its proposal, that "[w]here the court finds significant state action it will subject segregation or discrimination complaints to strict judicial scrutiny . . . ." 26 S. Proc., Pt. 9, 1983 Sess., p. 3170. In the House of Represen-

[14] In other states having equal protection provisions that enumerate particular protected classes a majority of courts has interpreted such provisions to require strict scrutiny of action that discriminates against members of the enumerated classes. *R. McG.* v. *J.W.,* 200 Colo. 345, 353, 615 P.2d 666 (1980); *People* v. *Ellis,* 57 Ill. 2d 127, 132–33, 311 N.E.2d 98 (1974); *Lowell* v. *Kowalski,* 380 Mass. 663, 666, 405 N.E.2d 135 (1980); *In the Interest of McLean,* 725 S.W.2d 696, 698 (Tex. 1987); contra *State* v. *Fuller,* 377 So. 2d 335, 337 (La. 1979); *Cox* v. *Cox,* 532 P.2d 994, 996 (Utah 1975); *Archer* v. *Mayes,* 213 Va. 633, 638, 194 S.E.2d 707 (1973). Some state courts have gone further, interpreting their equal protection provisions as requiring an absolute bar on any action that discriminates against members of classes enumerated in the provision. *Rand* v. *Rand,* 280 Md. 508, 511–16, 374 A.2d 900 (1977); *Henderson* v. *Henderson,* 458 Pa. 97, 101, 327 A.2d 60 (1974); *Darrin* v. *Gould,* 85 Wash. 2d 859, 877–78, 540 P.2d 882 (1975).

tatives, Representative Richard D. Tulisano stated that the amendment was intended to require application of strict scrutiny analysis to classifications based on physical or mental disability. 26 H.R. Proc., Pt. 11, 1983 Sess., p. 3975. Similar statements were made by Representatives Christine M. Niedermeier and Naomi K. Cohen. Id., pp. 3991, 3993.

We conclude, therefore, that amendment twenty-one's protection for those possessing physical and mental disabilities identifies the members of this class as a group especially subject to discrimination and requires the application of the highest standard of review to vindicate their constitutional rights. As the Appellate Court held, that standard requires strict scrutiny of the challenged government action.

B

Applying a strict scrutiny standard, we must determine whether the commissioner's exercise of his authority to condition the reinstated license in this case violated the plaintiff's right to equal protection under amendment twenty-one. The plaintiff maintains that the commissioner violated this constitutional right by imposing particular conditions—the submission of medical reports every three months for three years—without reference to any articulated standard justifying their imposition.

Strict scrutiny analysis requires state action resulting in unequal treatment to be justified in two particulars. State action can survive constitutional scrutiny only if it (1) serves a compelling state interest, and (2) is narrowly tailored to serve that interest. *Horton* v. *Meskill,* supra, 640. In this case, the plaintiff does not dispute that the state's asserted interest in highway safety is a compelling state interest. See *Burns* v. *Barrett,* 212 Conn. 176, 184, 561 A.2d 1378, cert. denied, 493 U.S. 1003, 110 S. Ct. 563, 107 L. Ed. 2d 558 (1989).

The only issue before us is, therefore, whether the action taken was sufficiently narrowly tailored to serve the state's interest in highway safety.

The Appellate Court determined that the reporting requirements imposed on the plaintiff were both necessary to protect the public safety and narrowly tailored to achieve this goal. The Appellate Court emphasized that the plaintiff was allowed to drive during this reporting period, that the reporting period was of limited duration, and that the reporting requirements were specifically limited to facts relating to the plaintiff's neurological disorder. *Daly* v. *DelPonte,* supra, 27 Conn. App. 506.

The plaintiff maintains, however, that the conditions imposed by the commissioner were not narrowly tailored because they did not directly address the plaintiff's particular medical condition and circumstances. As an example of the commissioner's limited inquiry, the plaintiff points to the absence of any administrative inquiry into the prognosis for his having future seizure episodes.

In an analogous context, in *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* supra, we reviewed the Connecticut Institute for the Blind's general exclusion of visually impaired individuals from positions as teacher's aides. In that case, which challenged the Institute's practice as violative of Connecticut's Fair Employment Practices Act, then General Statutes (Rev. to 1977) §§ 31-122 through 31-128, we were required to determine whether the general exclusion was justified by a " 'bona fide occupational . . . need.' " Id., 93–96; General Statutes (Rev. to 1977) § 31-126 (a). We struck down the general exclusion by noting that "[i]t is, however, eminently clear that the [Institute's] blanket exclusion of anyone without normal visual acuity, *without any effort to define*

*the specifications of the position* of teacher's aide *or to test the capacities of the complainant* for that position, cannot stand." (Emphasis added.) Id., 95–96.

In this case the commissioner determined that the plaintiff must report his medical status every three months for three years. The record contains no evidence that this reporting requirement was narrowly tailored either to the plaintiff's condition at the time of its issuance or to his probable future condition for the designated time period. As in *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* supra, the conditions here were imposed "without any effort to define the specifications . . . or to test the capacities of the complainant."

We recognize that the search for a "narrowly tailored" set of conditions may well leave discretion for the commissioner to choose among a number of medically reasonable responses that take into account the plaintiff's physical condition as well as the public's need for highway safety. In the face of medical disagreement about the proper treatment and prognosis for individuals suffering seizure disorders, an appropriate administrative inquiry may provide the foundation for the consideration of a number of medically responsible options. In this case, for example, the plaintiff's neurologist conceded that his own opinion regarding the plaintiff's condition was not an opinion with which all neurologists would concur. What the commissioner may not do, however, is to select a set of conditions that has no foundation whatsoever in the record. Neither the commissioner nor the hearing officer had the medical expertise to make an independent assessment of the risks posed by this plaintiff's driving and the relationship of proposed reporting requirements to minimizing that risk.

The essence of the plaintiff's legitimate complaint in this case lies, therefore, in the conjunction of his due process[15] and equal protection rights. In this case, the commissioner initially attempted to obtain a medically sound determination regarding the plaintiff's condition. Furthermore, the commissioner properly afforded the plaintiff a hearing regarding the license suspension. The commissioner's order is constitutionally defective, however, because it lacks support from an appropriately structured administrative inquiry into the proper scope of postreinstatement conditions tailored to the condition of this plaintiff. The legislature has put into place statutory authorization for precisely such a process of inquiry. See General Statutes §§ 14-46a through 14-46g; footnote 6. To safeguard the plaintiff's equal protection rights, the commissioner must avail himself of these processes so as to develop a medically appropriate response to the plaintiff's seizure disorder. Without such an inquiry, which the record discloses did not occur in this case, the commissioner's imposition of reporting requirements violated the plaintiff's equal protection right to a narrowly tailored remedy to safeguard the public's interest in safe highways.[16]

The judgment of the Appellate Court is reversed and the case is remanded to the Appellate Court with direction to remand it to the trial court with direction that the judgment dismissing the administrative appeal be reversed and that the case be remanded to the commissioner for further proceedings consistent with this opinion.

In this opinion the other justices concurred.

[15] Cf. *State* v. *Joyner,* 225 Conn. 450, 470–71, 625 A.2d 791 (1993); *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990) ("principles of fundamental fairness . . . are the hallmark of due process").

[16] After conducting the required inquiry, the commissioner may well find support for the reporting requirements imposed upon the plaintiff in this case. We do not mean to suggest that those, or other, postreinstatement reporting requirements are intrinsically unacceptable.