## PETRAQ BODE *v.* CONNECTICUT MASON CONTRACTORS, THE LEARNING CORRIDOR ET AL.
### (AC 32086)

Lavine, Alvord and McDonald, Js.

Argued March 17—officially released August 16, 2011

*Petraq Bode*, pro se, the appellant (plaintiff).

*Angelo Cicchiello* and *Jonathan A. Cantor* filed a brief for the appellant (plaintiff).

*Heather Porto*, with whom, on the brief, was *James L. Pomeranz*, for the appellees (defendants).

*Opinion*

ALVORD, J. The plaintiff, Petraq Bode, appeals from the decision of the workers' compensation review board (board) affirming the determination by the workers' compensation commissioner for the fifth district (commissioner) that he was not entitled to benefits pursuant

to General Statutes § 31-307.[1] On appeal, the plaintiff maintains, inter alia, that the board improperly affirmed the commissioner's decision (1) that the plaintiff was not temporarily totally disabled on or after April 26, 2005, (2) that the plaintiff demonstrated an unwillingness to submit to right shoulder replacement surgery and (3) that the plaintiff's psychiatric claim was not compensable. We reverse the decision of the board as to its affirmation of the commissioner's finding that the plaintiff was not temporarily totally disabled and conclude that the commissioner improperly considered the plaintiff's "unwillingness to submit to right shoulder replacement surgery" under § 31-307. We affirm the board's decision affirming the commissioner's finding that the plaintiff's psychiatric claim was not compensable.

The following facts and procedural history are relevant to this appeal. The plaintiff was born in Albania in 1947. He has only a limited understanding of the English language. He moved to the United States in 1999, and thereafter the defendant employer,[2] Connecticut Mason Contractors, The Learning Corridor, hired him as a laborer. On October 29, 2002, the plaintiff fell approximately thirty feet from scaffolding and suffered injuries. He was hospitalized for four days for treatment of fractures of the cervical spine, lumbar spine and right shoulder and for a right inguinal hernia, before being transferred to an acute rehabilitation center, where he remained for an additional two weeks.

The commissioner took administrative notice of a voluntary agreement approved on June 1, 2004. The

---

[1] General Statutes § 31-307 (a) provides in relevant part: "If any injury for which compensation is provided under the provisions of this chapter results in total incapacity to work, the injured employee shall be paid a weekly compensation equal to seventy-five per cent of the injured employee's average weekly earnings as of the date of the injury . . . ."

[2] Hartford Insurance Group is also a defendant in the present case.

commissioner made the following findings of fact: "As a . . . result of the compensable injuries, the parties agreed that the [plaintiff] sustained a ten percent (10%) Permanent Partial Disability to his lumbar spine, a fifteen percent (15%) Permanent Partial Disability to his cervical spine, and a seventeen percent (17%) Permanent Partial Disability to his right master arm. . . . The parties further agreed that the [plaintiff] reached Maximum Medical Improvement on July 29, 2003. . . . [The adjuster for the claim stated that] in January of 2004, there was a without prejudice agreement to pay permanency as of July 29, 2003, for 10% of the lumbar spine, 15% of the cervical spine, and 17% of the right upper extremity. That had totaled 90.31 weeks. After those benefits had expired, [the plaintiff was] paid without prejudice temporary partial . . . benefits . . . for periods of time. . . . [A]s of July 17, 2006, [the plaintiff was paid] temporary total benefits without prejudice." (Internal quotation marks omitted.) The commissioner concluded: "The [defendants] have paid the [plaintiff] all Permanent Partial Disability Benefits due to him thus far. . . . All payments made subsequent to the Permanent Partial Disability Benefits were made without prejudice by the [defendants]."

The plaintiff requested temporary total disability benefits, accruing after April 26, 2005. On December 18, 2007, February 8, June 3 and July 31, 2008, the commissioner held formal hearings on the plaintiff's claim for temporary total disability benefits. At these hearings, the plaintiff testified and provided medical records, vocational evaluations and "Record of Employment Contacts" forms in which he had recorded his unsuccessful efforts to find employment between May, 2003, and December, 2006. The defendants produced three deposition transcripts and an independent vocational evaluation.

The board summarized the transcript of the plaintiff's testimony during the hearings as follows: The plaintiff "testified at length regarding his physical condition, contending that he has been totally disabled since the accident and currently suffers from tremors and shoulder pain that did not exist prior to the accident. He testified that he can only stand for ten to fifteen minutes at a time and that he could 'never' remain sitting at a desk for two hours continuously. . . . The [plaintiff] also indicated that he does not attend social events and 'cannot work because he is in too much pain.' . . . The [plaintiff] testified he could not complete a job application in English and does not read English newspapers. The [plaintiff] denied being able to work in the capacity of a parking lot attendant, coat room attendant, small parts inspector, or janitor. [He] also testified that because of his constant pain, he began to experience symptoms of depression. Finally, [the plaintiff] 'stated that he has been walking with the aid of a cane since 2003 because, without it, he would start feeling dizzy and fall.' "

Additionally, the plaintiff produced a number of medical records at the hearing. These records reflected that throughout 2003, several doctors opined that the plaintiff was able to perform "light-duty" work. The remaining records produced, showing medical treatment between 2003 and 2008, memorialized the plaintiff's repeated complaints to medical professionals related to his injuries. None of the physicians opined that the plaintiff was totally disabled or unable to work on or after April 26, 2005. The plaintiff also provided three records showing psychiatric care.[3]

On July 7, 2005, Nicola A. DeAngelis, an orthopedic surgeon, told the plaintiff that he had four treatment

---

[3] On August 15, 2007, Carl E. Fulwiler, a psychiatrist, performed a psychiatric clinic evaluation on the plaintiff. The record also contains notes for two subsequent visits to Fulwiler, on August 29 and September 24, 2007.

options for his right shoulder. These included (1) a conservative course of physical therapy and anti-inflammatories, (2) an intra-articular injection, (3) arthroscopic surgery or (4) a total shoulder replacement. He underwent arthroscopic surgery on that shoulder on September 16, 2005. Despite initial improvement, noted in two reports of follow-up visits on September 28 and November 3, 2005, the plaintiff's symptoms returned, at which point DeAngelis opined at an April 27, 2006 office visit that the plaintiff's "best option" was a total shoulder replacement. Over the next year, the plaintiff continued to consult physicians and the medical records reflect that he alternately expressed an interest in the joint replacement surgery, stated he was not interested, or requested time to think about it.

Reports of four vocational evaluations were entered into evidence. The first evaluation was performed by Ronald Freedman, a certified vocational rehabilitation specialist, in October, 2003. His November, 2003 report, based on this evaluation (November, 2003 vocational report), concluded that the plaintiff "now can do a limited range of light to sedentary work." The second evaluation, performed during January, 2004, with results set forth in a February, 2004 report (February, 2004 vocational report), also concluded that the plaintiff was "presently employable." An August, 2004 report (August, 2004 vocational report) stated that the plaintiff did "not present as able to meet the demands and expectations of competitive employment." The plaintiff's records were reevaluated during July, 2008, again by Freedman (July, 2008 vocational report), who concluded that due to his worsening condition the plaintiff was completely unemployable.

At the hearing, the defendants produced a deposition transcript from Peter R. Barnett, an orthopedic surgeon, in which Barnett opined that as of an office visit on September 19, 2006, the plaintiff had the capacity to

work, despite the "bad right shoulder." On January 21, 2009, the commissioner issued a written opinion, identified three issues, made a number of findings of fact and, inter alia, dismissed the claim for temporary total disability benefits and the claim for compensable psychiatric treatment.

In its decision dated March 3, 2010, the board affirmed the decision of the commissioner. Specifically, the board concluded that, inter alia, the plaintiff failed to meet his burden of proving eligibility for temporary total disability benefits because (1) he "did not introduce one medical report in which a physician opined that [he] was totally disabled," (2) "the trier was presented with conflicting vocational expert testimony" and (3) it was "well within the power of the [plaintiff] to have procured a report clarifying the period(s) of total disability following the surgery of September 16, 2005 . . . ." The board also upheld the commissioner's conclusion that the plaintiff "demonstrated an unwillingness" to proceed with the shoulder surgery because this finding was supported by the record, and concluded that "[i]t may be reasonably inferred that it appeared to the commissioner that the [plaintiff] had failed to avail himself of 'reasonable medical assistance . . . .' " Finally, the board stated that "because this board is not empowered to overturn a trier's evidentiary determinations unless they lack foundation in the record . . . the trial commissioner's decision to dismiss the [plaintiff's] psychiatric claim must stand." (Citations omitted.) This appeal followed. Additional facts will be set forth as necessary.

"As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals. The principles that govern our standard of review in workers' compensation appeals are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts

or from an inference illegally or unreasonably drawn from them. . . . It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board. . . . A state agency is not entitled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny." (Internal quotation marks omitted.) *Deschenes* v. *Transco, Inc.*, 288 Conn. 303, 311, 953 A.2d 13 (2008). "The commissioner has the power and duty, as the trier of fact, to determine the facts." (Internal quotation marks omitted.) *Cervero* v. *Mory's Assn., Inc.*, 122 Conn. App. 82, 90, 996 A.2d 1247, cert. denied, 298 Conn. 908, 3 A.3d 68 (2010).

I

The plaintiff claims[4] that the board improperly affirmed the commissioner's decision that the plaintiff was not temporarily totally disabled because the commissioner (1) arbitrarily disregarded evidence that he underwent right shoulder surgery on September 16, 2005,[5] and the uncontroverted vocational expert opinions and (2) improperly found that the plaintiff demonstrated an unwillingness to submit to right shoulder replacement surgery. We reverse the decision of the board affirming the commissioner's finding that the plaintiff was not temporarily totally disabled and conclude that the commissioner improperly considered the plaintiff's "unwillingness to submit to right shoulder replacement surgery" in his application of § 31-307.

Under the Workers' Compensation Act, General Statutes § 31-275 et seq., "[a] worker is entitled to total

---

[4] The plaintiff was permitted to file a brief as a self-represented party in addition to the brief filed by counsel for the plaintiff. At oral argument, the court granted the motion to withdraw filed by the plaintiff's counsel, and the plaintiff argued as a self-represented party.

[5] The plaintiff claims that "[c]ommon sense mandates that if a person is undergoing [shoulder surgery] he cannot work [on] that day. The operative report should suffice for such a common sense conclusion."

disability payments pursuant to . . . § 31-307 only when his injury results in a total incapacity to work, which [our Supreme Court has] defined as the inability of the employee, because of his injuries, to work at his customary calling or at any other occupation which he might reasonably follow." (Internal quotation marks omitted.) *Krevis* v. *Bridgeport*, 63 Conn. App. 328, 336, 777 A.2d 196 (2001). Our Supreme Court stated in *Osterlund* v. *State*, 135 Conn. 498, 66 A.2d 363 (1949), that "[a] finding that an employee is able to work at some gainful occupation within his reasonable capacities is not in all cases conclusive that he is not totally incapacitated. If, though he can do such work, his physical condition due to his injury is such that he cannot in the exercise of reasonable diligence find an employer who will employ him, he is just as much totally incapacitated as though he could not work at all." Id., 506–507. "If, because of the employee's injury, his labor becomes unmarketable, in spite of his diligent efforts to find work, his earning power is gone and he is totally incapacitated." *Czeplicki* v. *Fafnir Bearing Co.*, 137 Conn. 454, 456–57, 78 A.2d 339 (1951).

This court previously has stated that "[i]n order to receive total incapacity benefits under § 31-307, a plaintiff bears the burden to demonstrate a diminished earning capacity by showing either that she has made adequate attempts to secure gainful employment *or* that she truly is unemployable. . . . Whether the plaintiff makes this showing of unemployability by demonstrating that she actively sought employment but could not secure any, or by demonstrating through a nonphysician vocational rehabilitation expert or medical testimony that she is unemployable . . . as long as there is sufficient evidence before the commissioner that the plaintiff is unemployable, the plaintiff has met her burden." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Marandino* v. *Prometheus Pharmacy*, 105 Conn. App. 669, 684–85, 939 A.2d 591 (2008),

rev'd in part on other grounds, 294 Conn. 564, 986 A.2d 1023 (2010).

"Whether a claimant is realistically employable requires an analysis of the effects of the compensable injury upon the claimant, in combination with his pre-existing talents, deficiencies, education and intelligence levels, vocational background, age, and any other factors which might prove relevant. This is of course the analysis that commissioners regularly undertake in total disability claims . . . . A commissioner always must examine the impact of the compensable injury upon the particular claimant before him." R. Carter et al., 19 Connecticut Practice Series: Workers' Compensation Law (2008 Ed.) § 8:40, p. 301.

The import of *Osterlund* v. *State*, supra, 135 Conn. 498, is that the commissioner must evaluate not only the physical incapacity of the plaintiff, but the effect that the physical injury has on the plaintiff's employability. In the present case, we acknowledge that, as the board noted, "the [plaintiff] did not introduce one medical report in which a physician opined that the [plaintiff] was totally disabled." Further, the commissioner had before him deposition testimony from the defendants' independent medical examiner, Barnett, stating that the plaintiff had the "capacity" to work, although limited to certain physical functions. The medical evidence undisputedly indicates that the plaintiff had some work capacity, however limited. The commissioner's inquiry, however, as to whether the plaintiff was realistically employable should not have ended with his review of the physicians' assessments of the plaintiff's physical capabilities. Under the facts of this case, the commissioner's decision necessarily involved his consideration of the plaintiff's testimony and his review of the record

of employment contacts forms[6] and the four vocational reports.[7]

The plaintiff claimed total temporary disability arising on April 26, 2005.[8] Several vocational reports were introduced into evidence, including the November, 2003 vocational report[9] and the February, 2004 vocational report. None of the vocational experts testified at the hearing. The February, 2004 vocational report, which was produced at the defendants' request, was the only one that, without equivocation, concluded that the plaintiff was *"presently* employable." (Emphasis added.) It was silent as to the plaintiff's employability in the future. Both the November, 2003 and February, 2004 vocational reports indicated a single day on which the plaintiff was evaluated. Thus, the February, 2004 vocational report stands alone as unequivocal evidence before the commissioner that the plaintiff was employable.

---

[6] See *Howard* v. *CVS Pharmacy, Inc.*, No. 5063 CRB-2-06-3 (April 4, 2007) (while evidence of job searches is "not an absolute requirement" to establish entitlement to § 31-307 (a) total disability benefits, "[i]t . . . does provide clear evidence as to whether the claimant has met the standard for total disability").

[7] Expert vocational testimony is not *required* to establish or to refute a claim of total incapacity; see 19 R. Carter et al., supra, § 8:43, p. 307; but in this case the plaintiff provided such evidence and the record shows no reason to discount it summarily.

[8] See *Cummings* v. *Twin Tool Mfg. Co.*, 40 Conn. App. 36, 668 A.2d 1346 (1996) ("[t]otal incapacity becomes a matter of continuing proof for the period claimed"; [internal quotation marks omitted] id., 39; and "the burden of proof was on the plaintiff to establish his continuing total incapacity from [the date of the claim], forward"; id., 42).

[9] That report provided that the plaintiff's "work history shows that to be successful at finding work, he had to be dependent on being able to do jobs at the upper ranges of the strength capacities . . . . [H]is reduction to the light to sedentary ranges now requires him to work inside, at work sites where his lack of language facility may become more problematic . . . . This factor will also impact the job searches he can be successful at. In summary, [the plaintiff] is an older gentleman, who can now do a limited range of light to sedentary work. . . . A supported employment situation can determine if this individual can reach competitive productivity norms."

The plaintiff produced two reports that stated he was unemployable, both completed after the November, 2003 and February, 2004 vocational reports. One such report, the August, 2004 vocational report, was completed over the course of seven days. The evaluator noted that the plaintiff was "unable to communicate in English. . . . The [plaintiff's] physical discomfort was apparent and manifested by his inability to maintain a seated position. . . . The [plaintiff] attempted to complete testing in a combination of sitting and a standing position . . . . This accommodation was never sufficient in that he continued to require time to completely recline on the raised mat and invariably ended the day after approximately two hours." The evaluation for the August, 2004 vocational report was scheduled to occur over a ten day period, but the vocational expert ended his evaluation after seven days upon noting that "the [plaintiff] presented as extremely fatigued and attempting to cope with heightened discomfort. He reported dizziness, appeared ashen . . . . The [plaintiff] was tearful . . . ." The report indicates that the expert spoke with the plaintiff's "Workers' Compensation Coordinator" who was "agreeable to ending the evaluation, with the knowledge that the client is clearly unable to work at this time." The August, 2004 vocational report concluded that "[t]he client does not present as able to meet the demands and expectations of competitive employment. It is recommended that the client investigate his eligibility for Social Security benefits."

During July, 2008, while the formal hearings were being held on the April, 2005 claim, Freedman, the vocational expert who produced the November, 2003 vocational report, reviewed the plaintiff's updated medical records and provided a revised opinion that "when I add to [my observations of the plaintiff's medical issues] the facts that [the plaintiff] still is not fluent in English

and is now over 60 years old, the prospects for any type of employment I feel are nil. . . . I feel that this man is totally unemployable."[10] In his decision, the commissioner only made two findings with regard to the vocational reports. He noted that the February, 2004 vocational report concluded that the plaintiff was employable, while the July, 2008 vocational report concluded he was unemployable. The commissioner did not make any finding as to the reliability of the vocational evidence, and further, in his decision ignored completely the August, 2004 vocational report.[11]

The board suggested that the trier of fact was presented with conflicting vocational expert testimony and, thus, it was his responsibility to accept or reject the testimony. In workers' compensation cases, "the opinions of experts [are] to be received and considered as in other cases generally . . . ." (Internal quotation marks omitted.) *Keenan* v. *Union Camp Corp.*, 49 Conn. App. 280, 284, 714 A.2d 60 (1998). Although it is true that, ordinarily, a commissioner is not required to accept as true the opinion of any medical expert; *Daly* v. *Del-Ponte*, 225 Conn. 499, 517, 624 A.2d 876 (1993); in this case there was no basis reflected in the record for the commissioner to discount the August, 2004 vocational

---

[10] The board previously has affirmed the commissioner's finding that an individual is disabled where he "lacks the tenets of employability," and where factors rendered that individual's labor unmarketable when combined with the physical restrictions resulting from the compensable injuries. See, e.g., *Hidvegi* v. *Nidec Corp.*, No. 3607 CRB-05-97-05 (June 15, 1998) (although claimant had light duty capacity, she was temporarily totally disabled because she was not capable of any degree of work and not employable on basis of physical restrictions, age, limited education and lack of transferable skills); *Rose* v. *Hartford Hospital*, 14 Conn. Workers' Comp. Rev. Op. 249, 251 (1995) (although claimant had light duty work capacity, he was temporarily totally disabled due to his age, deafness, inability to speak English, and limited education).

[11] The commissioner did not include the August, 2004 report in his decision, but the board reviewed that report in its assessment of the vocational evidence.

report or the July, 2008 vocational report, both of which were the results of evaluations that were more appropriately scheduled in conjunction with the April, 2005 date on which the plaintiff claimed benefits and were closer in time to the 2008 and 2009 hearing dates. See *Loring* v. *Planning & Zoning Commission*, 287 Conn. 746, 759, 950 A.2d 494 (2008) ("must be some basis in the record to support the [trier of fact's] conclusion that the evidence of the [expert witness] is unworthy of belief" [internal quotation marks omitted]); *Pietraroia* v. *Northeast Utilities*, 254 Conn. 60, 756 A.2d 845 (2000) (commissioner abused his discretion in dismissing in part workers' compensation claim, because there was no basis on record to disregard written medical opinions indicating that plaintiff was unavailable). Compare *Cummings* v. *Twin Tool Mfg. Co.*, 40 Conn. App. 36, 42–43, 668 A.2d 1346 (1996) (commissioner specifically rejected testimony when no evidence supported expert's conclusion).

Furthermore, our Supreme Court previously has declined to afford deference to the commissioner's credibility determinations when such determinations were based solely on documentary evidence, noting that "no testimony regarding any of the underlying assertions was taken. All of the facts . . . were reflected in the medical reports from the physicians . . . . Thus, the deference we normally would give to the commissioner on issues of credibility is not warranted in the present case, because we are as able as he was to gauge the reliability of those documents." *Pietraroia* v. *Northeast Utilities*, supra, 254 Conn. 75.

This court may review the vocational documents, job search forms and medical records to determine, as a matter of law, whether the plaintiff was employable. See *Lash* v. *Freedom of Information Commission*, 300 Conn. 511, 520, 14 A.3d 998 (2011) (reviewing contents

of documents and concluding that commission's determination was incorrect "as a matter of law"); *Jacob* v. *Seaboard, Inc.*, 28 Conn. App. 270, 274, 610 A.2d 189 (question of law arises as to legal inferences to be drawn from documents where record before this court is identical to record before trial court and when trial court had no occasion to evaluate credibility of witnesses), cert. denied, 223 Conn. 923, 614 A.2d 822 (1992). The record reflects that there was no evidence that the plaintiff *was* employable, at any time, after February 5, 2004. There were two vocational reports dated August, 2004, and July, 2008, both of which stated the plaintiff *was not* employable. The commissioner also had before him the job search forms showing the plaintiff's failed attempts to secure employment. Despite this evidence, he (1) made no conclusions as to the reliability of the vocational reports or regarding the plaintiff's employability, (2) ignored the August, 2004 vocational report and the job search forms and (3) concluded that the plaintiff was not entitled to total temporary disability benefits.

Additionally, the commissioner had before him evidence that the plaintiff had shoulder surgery during the time that he claimed temporary total disability. As the board stated, it was "eminently reasonable to infer that [the plaintiff] probably did experience a period of total disability associated with the surgery performed on his right shoulder on September 16, 2005 . . . ." In refusing to award such disability benefits, the board pointed to the absence of "appropriate documentation" and ignored the fact that, although there were only three records directly concerning the arthroscopic surgery, the plaintiff did produce a medical report from DeAngelis, an orthopedic surgeon, in which she opined that it would take "six or eight weeks to do most of the recovery from the surgery and up to four to six months to recover completely." While we agree with

the board that the commissioner is not compelled to award temporary total disability benefits based solely on speculation as to the plaintiff's condition after the surgery, the medical records alone show that, at the very least, the plaintiff was disabled on the day the surgery was performed.

Although the commissioner could have attached great weight to the medical reports and physician's deposition testimony in reaching his conclusion not to extend benefits, this evidence illustrates only the plaintiff's physical capacity. In the present case, there was also the plaintiff's testimony, proof that he attempted to secure employment and two timely vocational reports in which the experts opined he was completely unemployable. The record reflects no reason for the commissioner to have summarily disregarded this evidence. Under the *Osterlund* standard, and given the specific facts of this case, the commissioner had to consider the vocational evidence in his finding that the plaintiff failed to meet his burden. On the basis of our review of the documents, we determine that the only reasonable conclusion that the commissioner could have arrived at is that the plaintiff was unemployable, at least for portions of the time when he claimed benefits. The commissioner's determination that the plaintiff was not temporarily totally disabled resulted from an incorrect application of the law to the subordinate facts and from inferences unreasonably drawn from those facts.

Our analysis does not end with the assessment of the plaintiff's employability. A significant number of the commissioner's conclusions concern the plaintiff's "unwillingness to submit to right shoulder replacement surgery." The commissioner's findings include: "[t]he [plaintiff] has demonstrated an unwillingness to submit to right shoulder replacement surgery," "the [commission has] authorized the . . . replacement surgery and

continue[s] to hold out that option," "[t]here is competent and persuasive medical evidence to indicate that the [plaintiff] is limiting his recovery by not opting for right shoulder replacement surgery," and "[t]here is competent and persuasive medical evidence to indicate that the [plaintiff's] right shoulder condition may worsen as a result of his refusal to have right shoulder replacement surgery." The commissioner did not cite a statute under which he considered the refusal of treatment. We conclude that the commissioner improperly considered the plaintiff's alleged refusal of surgery and the reasonableness of the treatment in his finding that the plaintiff was not temporarily totally disabled under § 31-307.

Both the board and the plaintiff cite General Statutes § 31-294e (b) in setting out the standard for the rejection of reasonable medical care, but fail to address directly the commissioner's misapplication of the statutory section to an altogether separate inquiry as to the plaintiff's employability under § 31-307. Section 31-294e, by its terms, governs the *suspension* of compensation that would otherwise be warranted and provides that "[i]f it appears to the commissioner that an injured employee has refused to accept and failed to obtain reasonable medical and surgical aid or hospital and nursing service, all rights of compensation under the provisions of this chapter shall be suspended during such refusal and failure." General Statutes § 31-294e (b). According to Black's Law Dictionary (9th Ed. 2009), the term "suspension" means "[t]he act of temporarily delaying, interrupting or terminating something." See also R. Carter et al., 19A Connecticut Practice Series: Workers' Compensation Law (2008 Ed.) § 25:9, pp. 58–59, titled "Penalty for Refusing Medical Care" ("[T]he Draconian measure of suspension of benefits is rarely applied, given that some autonomy over one's corpus is tacitly presumed, especially where unwanted surgery is at

issue. . . . [T]he commissioner has discretion to decide whether the treatment is reasonable and whether refusal deserves punishment."). Thus, considering the plaintiff's refusal to undergo shoulder replacement surgery when concluding whether the plaintiff may receive benefits under § 31-307 is a misapplication of the law.

The Workers' Compensation Act "is remedial and must be interpreted liberally to achieve its humanitarian purposes." *Gil* v. *Courthouse One*, 239 Conn. 676, 682, 687 A.2d 146 (1997). We conclude, under the particular facts of the present case, that the commissioner improperly disregarded the weight of the evidence that the plaintiff was temporarily totally disabled under *Osterlund* because, as a matter of law, he was unemployable for at least a portion of the time he claimed. We also conclude that the commissioner misapplied the law by considering the plaintiff's "unwillingness" to submit to right shoulder replacement surgery in his evaluation of the plaintiff's temporary total disability claim. Accordingly, we conclude that the board improperly affirmed the commissioner's finding that the plaintiff was not entitled to temporary total disability benefits. On the specific facts of this case, we reverse the decision of the board affirming the commissioner's finding that the plaintiff is not entitled to temporary total disability benefits.

## II

The plaintiff also claims that the commissioner and the board committed reversible error in finding that the plaintiff's psychiatric claim was not compensable. We disagree, and affirm the decision of the board.

As noted previously, we are limited to determining whether the board's conclusions on the basis of the facts "result[ed] from an incorrect application of the law to the subordinate facts or from an inference illegally or

unreasonably drawn from them. . . . In other words, [t]hese conclusions must stand unless they could not reasonably or logically be reached on the subordinate facts." (Internal quotation marks omitted.) *Sellers* v. *Sellers Garage, Inc.*, 80 Conn. App. 15, 19–20, 832 A.2d 679, cert. denied, 267 Conn. 904, 838 A.2d 210 (2003). "[I]n Connecticut traditional concepts of proximate cause constitute the rule for determining . . . causation [in a workers' compensation case]. . . . An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm. . . . The finding of actual cause is thus a requisite for any finding of proximate cause." (Citation omitted; internal quotation marks omitted.) *Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564, 591, 986 A.2d 1023 (2010).

The plaintiff has the burden of proving the causal relationship between the physical injury suffered and the claimed psychiatric symptoms. See General Statutes § 31-275 (16) (B) (ii).[12] Apart from the plaintiff's testimony at trial, the record contains only three medical records pertaining to the plaintiff's mental health, none of which included a definitive medical opinion that the symptoms were related to the compensable injury. In light of our deference to the authority of the commissioner to evaluate the evidence, and the absence of evidence of a causal relationship between the plaintiff's physical injury and his depression, we agree with the

___

[12] General Statutes § 31-275 provides in relevant part: "As used in this chapter, unless the context otherwise provides: (1) 'Arising out of and in the course of his employment' means an accidental injury happening to an employee or an occupational disease of an employee originating while the employee has been engaged in the line of the employee's duty in the business or affairs of the employer upon the employer's premises, or while engaged elsewhere upon the employer's business or affairs by the direction, express or implied, of the employer, provided . . .

"(16) . . . (B) 'Personal injury' or 'injury' shall not be construed to include . . . (ii) A mental or emotional impairment, unless such impairment arises (I) from a physical injury or occupational disease . . . ."

board that the trial commissioner's decision to dismiss the plaintiff's psychiatric claim must stand.

The decision of the workers' compensation review board is reversed only as to the denial of temporary total disability benefits and the consideration of the plaintiff's "unwillingness to submit to right shoulder replacement surgery" under § 31-307, and the case is remanded to the board with direction to reverse the commissioner's decision on those two issues and to remand the case to the commissioner for further proceedings according to law. The decision is affirmed in all other respects.

In this opinion LAVINE, J., concurred.

MCDONALD, J., concurring. I agree with the majority opinion. I only wish to add that I believe the workers' compensation review board, while misapplying General Statutes § 31-307, also incorrectly upheld the withholding of all temporary disability benefits after April 26, 2005.

Following the shoulder surgery performed on the plaintiff, Petraq Bode, by Nicola A. DeAngelis, an orthopedic surgeon, on September 16, 2005, DeAngelis reported on April 27, 2006, that there was some improvement but that the plaintiff's symptoms returned and his best option was a total shoulder replacement. It is the plaintiff's "demonstrated . . . unwillingness to submit to right shoulder replacement surgery," which the board found unreasonable, triggering the suspension of all such benefits. I note that the commissioner and the board did not set a date when delaying the further and drastic surgery became unreasonable. In these circumstances, where there has been one failed surgery and the

patient sought other medical advice or second opinions[1] regarding the risks and benefits of the proposed surgery, a recognized course of patient conduct,[2] I would conclude that the failure to immediately undergo total shoulder replacement was not unreasonable. I believe the board should not have upheld the withholding of all temporary disability benefits from April 26, 2005, forward.

---

[1] In the discussion of the partial disability, the commissioner and the board found that the plaintiff's symptoms returned after the September 16, 2005 shoulder surgery and that he sought these second opinions. Over the next three months, the plaintiff continued to consult physicians and the medical records reflect that on May 15, 2006, the plaintiff consulted Michael A. Brown, an orthopedic surgeon, for an outpatient consultation to discuss the risks and benefits of shoulder replacement surgery; on July 20, 2006, the plaintiff consulted Theodore Shoemaker, a medical doctor, to discuss possible shoulder surgery; and on July 31, 2006, the plaintiff consulted Tara Rizvi, a rheumatologist, to discuss possible shoulder surgery.

[2] "The single most important way you can stay healthy is to be an active member of your own health care team. . . . No surgery is risk free. It is important to learn about the possible benefits and risks involved in the surgical procedure . . . . Research has shown that patients who are informed about their procedure can better work with their doctors to make the right decisions. Getting a second opinion is important." Beth Israel Deaconess Medical Center in partnership with the United States Department of Health & Human Services, "Questions to Ask Your Doctor Before Having Surgery," available at http://www.bidmc.org/YourHealth/HealthNotes/Surgery/QuestionstoAskYourDoctorBeforeHavingSurgery.aspx (last visited July 27, 2011).

"Second opinions offer a different perspective on a condition that has previously been assessed. By asking a different physician to look at [a] case, [one] may learn new ways to treat [a] condition or simply obtain reassurance

that [a] current treatment plan is the most appropriate." Massachusetts General Hospital, Vascular Center, "Second Opinions," available at http://www.massgeneral.org/vascularcenter/appointments/secondopinions.aspx (last visited July 27, 2011).