STATE OF CONNECTICUT *v.* JEFFREY RIDDICK
(AC 20519)

Lavery, C. J., and Spear and Mihalakos, Js.

Argued September 27, 2000—officially released January 2, 2001

*James B. Streeto*, deputy assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Maureen Keegan*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Jeffrey Riddick, appeals from the judgment of conviction, rendered after

a jury trial, of murder in violation of General Statutes § 53a-54a[1] and risk of injury to a child in violation of General Statutes § 53-21 (1).[2] The defendant claims that the trial court improperly (1) denied his motion for additional equipment to assist him with his hearing impairment during the trial, (2) denied his motion to suppress his confession, (3) denied his motion in limine regarding a bloodstained towel that was introduced into evidence, (4) allowed his confession into evidence because it was inherently unreliable and (5) instructed the jury that it could consider the circumstances under which the defendant's statement was taken, including a lack of corroboration, the failure to record the statement electronically, and the defendant's physical and mental state. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the morning of December 25, 1996, the victim, Gertrude Teasley, was discovered by her son, Lacy Lewis, on the floor of her apartment bludgeoned and stabbed about the head and neck. When Lewis discovered the victim, the victim's two year old child was standing over her, crying. Lewis summoned the authorities.

Arkady Katsnelson, the state medical examiner, performed an autopsy on the victim's body. The victim was struck on the head at least seven times with a blunt object such as a brick. The victim also was stabbed

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with the intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered . . . or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

in the neck twelve times after she was unconscious. Defensive wounds were found on the victim's hands.

The police determined that the defendant was the last person to see the victim alive. At about 4 p.m. on Christmas day, Sergeant Neil O'Leary, Lieutenant Michael Ricci and Sergeant Gary Pelosi of the Waterbury police department arrived at the apartment of the defendant's mother-in-law and asked to see the defendant. The defendant agreed to accompany the officers to the police station to discuss the death of the victim.

At about 4:30 p.m., Ricci and Pelosi brought the defendant into an interview room at the police station and asked him if he was willing to discuss the victim's death. The defendant agreed. Prior to questioning, Ricci had the defendant read the *Miranda*[3] card aloud.

At about 9:30 p.m., the defendant informed Ricci that he wanted to "get something off his chest" and, thereafter, admitted that he had killed the victim. The defendant provided the officers with accurate details of the crime. Ricci then asked the defendant if he would put his confession in writing. The defendant agreed, and Ricci had him read the *Miranda* rights aloud again and sign a waiver of those rights.

The defendant's confession was read into evidence at trial. From that reading, the jury could have found that the defendant went to visit the victim and her two year old daughter at about 7 p.m. on December 23, 1996. The defendant spoke with the victim for some time. After the two year old child fell asleep on the sofa, the victim gave the defendant ten dollars and asked him to go out and buy her some crack cocaine. The defendant returned with the crack cocaine, but neither the victim nor the defendant was successful in lighting it. The

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

victim thereafter became angry and began yelling at and grabbing the defendant. The defendant then picked up a brick and hit the victim in the head several times. The victim pulled a knife out from under a couch cushion. The defendant took the knife away from the victim and stabbed her in the throat and neck. The defendant then took a towel from the bathroom and attempted to wipe the victim's blood off the walls. He wrapped the brick that he had used to bludgeon the victim in the bloody towel and left the apartment.

Shortly before midnight on December 25, 1996, the defendant was placed under arrest. After being arrested, the defendant led the police officers to the empty lot in which he had left the bloody brick and to the sewer into which he had thrown the bloody towel. Blood samples were taken from the victim, the bloody brick and the bloody towel. Not enough DNA was gathered from the towel for testing. The DNA from the bloody brick and the victim, however, matched.

At trial, Henry Lee, chief criminalist for the state of Connecticut and director of the state police forensic laboratory, established a sequence of events from the physical evidence left at the victim's apartment. According to Lee's testimony, the attack occurred in multiple locations around the apartment.

The defendant first claims that the court improperly denied his motion for additional listening equipment to assist him during the trial. We disagree.

The defendant is hearing impaired and required the aid of a listening device to participate in his trial. Prior to the trial's commencement, a hearing was held during which the court, *Iannotti, J.*, found that the defendant was hearing impaired and, therefore, entitled to a mechanical listening aid. The defendant was allowed to choose between the FM Wireless system or the CART

system. After trying both systems, the defendant chose the CART system.

CART is a computer assisted simultaneous transcription system. The defendant was provided with a monitor on which he could read the transcription of everything that was said during his trial. The text of the transcription scrolled up the screen as the trial progressed.

The defendant also raised this claim before the trial court, *Gill, J.*, in a motion for additional equipment that he had filed during jury selection. The defense requested that a Brauser system be obtained to work in conjunction with the CART system. A Brauser system would have allowed the defendant to stop the scrolling text on his monitor at any time so that he could read more slowly. It also would have allowed him to back up and read text that already had scrolled past. The defendant argued that this was necessary because he was having difficulty keeping up with the speed of the scrolling. The court, *Gill, J.*, found that the CART system was adequate and that there was no need for a Brauser system.[4]

---

[4] Judge Gill carefully evaluated the efficacy of the CART system before denying the defendant's request for a Brauser system, as evidenced in the following excerpt from the transcript of Judge Gill's oral ruling: "The court's going to rule on the motion as amended as follows. I have watched this present system work now for three days, and the defendant obviously has watched the same screen as I have. I am amazed at its efficiency. It's quite remarkable, actually. The screen appears virtually contemporaneously with the utterance of the words by the participants. They are very accurately displayed on a very clear screen. I have no concerns that there might be a spelling error. Hearing people, listening to witnesses live in a courtroom, I don't always catch every word that's said or the meanings of those words. While it may be true that words in a trial would be different from everyday life, that is true whether you are reading them or hearing them. The defendant is not a stranger to the criminal process and so I suspect that many of the words will not be as foreign to him as to others. The cost of the system—that is the increased cost—was not a factor in my decision here whatsoever. I've observed the defendant watching the screen intently. He consults with his attorney after most or many of the questioning of the veniremen. . . . This system is so good that it even puts the regular court reporter's remarks to the court and to the venire people such as 'speak louder,' or 'what did

Neither this court nor our Supreme Court has addressed the legal standard applicable to a hearing impaired person's right to an interpreter or to equipment. Our Supreme Court, however, has "stated in dictum that [t]he federal due process clause requires continuous translations at trial when a non-English speaking defendant cannot understand or appreciate the proceedings." (Internal quotation marks omitted.) *State* v. *Munoz*, 233 Conn. 106, 132, 659 A.2d 683 (1995). "A hearing-impaired defendant's right to due process may be implicated in the same way that the absence of an interpreter for a non-English speaking defendant's right may be implicated: 'A defendant who cannot hear is analogous to a defendant who cannot understand English, and a severely hearing-impaired defendant cannot be tried without adopting reasonable measures to accommodate his or her disability.' " *People* v. *James*, 937 P.2d 781, 783 (Colo. App. 1996). "A number of courts have held, and we agree, that hearing-impaired defendants have a constitutional right to hearing assistance and an appropriate accommodation of that right. And,

you say,' on the screen. The defendant is about thirty-seven years of age. He has an employment history which means he had to apply for jobs and perform jobs. . . . Under the totality of the circumstances here, I don't believe that the defendant is entitled to have the state provide any more than we are doing now. . . . I, of course, will do my best to make a conscious effort during the trial and motion hearing to keep the tempo of the testimony slow paced to be of maximum assistance to the defendant. I'm not saying this is necessary, but I believe I'm acting with an abundance of caution and with the highest regard for my belief in a fair trial for all. . . . The court will also further accommodate the defendant during any evidence taken by any prearranged signal between the defendant and his counsel such as the raising of a hand or the touching of an arm which would prompt from defense counsel a request to the court to pause in the proceedings. I will grant that request immediately to allow verbal or written communication between the defendant and his lawyer. I will provide a read back of any testimony that he might have believed he missed with or without the presence of the juror as the situation indicates. Of course, the defense may order daily transcripts of the proceedings and review that daily transcript each day with the defendant. In view of all the foregoing, the motion is accordingly denied."

once a trial court has identified that a hearing-impaired defendant requires some assistance, the trial court has broad discretion in accommodating the defendant's right to that assistance." Id.

In reviewing whether the trial court abused its discretion, the issue "is not whether we would reach the same conclusion in the exercise of our own judgment, but only whether the trial court acted reasonably." *State* v. *Deleon*, 230 Conn. 351, 363, 645 A.2d 518 (1994). "Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) *Whalen* v. *Ives*, 37 Conn. App. 7, 21, 654 A.2d 798, cert. denied, 233 Conn. 905, 657 A.2d 645 (1995). "In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action." (Internal quotation marks omitted.) *Walton* v. *New Hartford*, 223 Conn. 155, 169, 612 A.2d 1153 (1992).

In the present case, the court found the defendant to be hearing impaired and, as an accommodation, provided him with the CART transcription system for use during the trial. The court acted within its broad discretion in ascertaining that the Brauser system was not required. We find no abuse of discretion by the court.

The defendant also raises the unpreserved claim that the court violated his right to a fair trial by not complying with the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. We disagree. "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and

clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

Although the record is adequate to review the defendant's claim and the claim is of constitutional magnitude, the claimed constitutional violation does not clearly exist. The defendant's contention that the court should have followed the language of the ADA[5] when deciding whether to grant him an additional accommodation in the form of the Brauser system is without merit. The court in this case, after a hearing and after giving the defendant his choice between two listening systems, made the decision to accommodate the defendant by providing him with the CART system. It was entirely at the discretion of the court whether to expand the defendant's accommodation through the addition

---

[5] Section 12132 of title 42 of the United States Code provides in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1994).

Title 28, § 35.160, of the Code of Federal Regulations (1999) provides: "(a) A public entity shall take appropriate steps to ensure that communications with . . . members of the public with disabilities are as effective as communications with others.

"(b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

"(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160 (1999).

The ADA defines a public entity as: "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131 (1) (1994).

For purposes of the ADA, the Connecticut Superior Court is considered to be a public entity. See *Galloway* v. *Superior Court of District of Columbia*, 816 F. Sup. 12, 19 (D.D.C. 1993).

of the Brauser system. We see no reason to question the decision of the court. The defendant was provided with a listening device so that he could participate in his own defense and follow the proceedings at trial. We find, therefore, that the defendant's constitutional rights were not denied and that he was afforded a fair trial.

The defendant next claims that the Connecticut constitution[6] contains broader protections for hearing impaired persons than the United States constitution,[7] and that the court violated those protections when it failed to provide him with an additional accommodation in the form of the Brauser system. This claim was not preserved at trial, and, therefore, we once again apply the four-pronged test of *Golding* as set out previously. See id. The record is adequate to review this claim. The claim is of constitutional magnitude in that it implicates the defendant's right to a fair trial. The defendant's constitutional rights under the Connecticut constitution, however, were not clearly violated. While we agree with the defendant that the Connecticut constitution does provide greater protections for hearing impaired persons than the federal constitution, we do not agree that the court improperly applied those protections in refusing to provide the defendant with the Brauser system.

We are satisfied that a plain reading of the applicable sections of the Connecticut and federal constitutions

[6] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him . . . ."

[7] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him . . . and to have the assistance of counsel for his defense."

illustrates that the Connecticut constitution does provide greater protections for the hearing impaired. Article first, § 8, of the Connecticut constitution imports language directly from the sixth amendment to the United States constitution, which provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI. Both constitutions contain similar language and, thus, provide similarly broad guarantees to criminal defendants.

The equal protection clause of the Connecticut constitution, article first, § 20, as amended by article twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." This clause contains language directly referencing physically disabled individuals that is not included in the United States constitution. Both this court and our Supreme Court have held that the equal protection clause of the Connecticut constitution does afford heightened protection to disabled individuals. See *Daly* v. *DelPonte*, 225 Conn. 499, 513–14, 624 A.2d 876 (1993); *State* v. *Haselman*, 33 Conn. App. 242, 246 n.6, 635 A.2d 310 (1993), cert. denied, 228 Conn. 921, 636 A.2d 851 (1994).[8] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." Section 1 of the fourteenth amendment to the

---

[8] While the defendant invokes the equal protection clause of the Connecticut constitution in support of his claim that that section affords broader protection to the disabled than its federal counterpart, he makes no claim that the trial court's ruling constituted discriminatory state action subject to the strict scrutiny analysis required by *Daly* v. *DelPonte*, supra, 225 Conn. 513–14.

United States constitution provides in relevant part that no state shall "deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Nowhere in the United States constitution are physical disabilities mentioned. Clearly, the Connecticut constitution provides broader protection for the hearing impaired through its specific references to the physically disabled.

In the present case, the defendant was not denied his right to a fair trial. The defendant asks us to apply the standard set forth in the Connecticut constitution and suggests that this standard would have required the trial court to provide him at trial with the Brauser system in addition to the CART system. We once again conclude that it was entirely within the court's discretion to conclude that the CART system was an adequate accommodation for the defendant.

The defendant next claims that the court deprived him of his constitutional right to understand the proceedings at his trial by denying his motion for additional listening equipment. To prevail on this claim, the defendant must show an abuse of discretion by the trial court. In this case, "the basic constitutional inquiry is whether any inadequacy in the [method of] interpretation made the trial fundamentally unfair . . . ." (Internal quotation marks omitted.) *State* v. *Munoz*, supra, 233 Conn. 134. We find that it was within the court's discretion to decide that the CART system was adequate without the addition of the Brauser system and that the defendant's use of the CART system during trial did not result in a fundamentally unfair trial. The court did not abuse its discretion.

The defendant also claims that the court's decision not to provide him with the Brauser system denied him a fair trial. We see no fundamental difference between

this claim and the defendant's previous claim. We, therefore, refer to our previous discussion and conclude that it was within the court's discretion to decide that the CART system was adequate without the addition of the Brauser system, and that the defendant's use of the CART system during trial did not result in a fundamentally unfair trial.

The defendant next claims that the court improperly denied his motion to suppress his confession. At trial, the defendant moved to suppress his confession on the grounds that (1) the police violated his fourth amendment rights because the confession was the result of an unwarranted seizure and (2) the confession was involuntary because the police did not take into account the defendant's hearing impairment during questioning. We disagree.

"It is well settled that [i]f the police obtain physical evidence or statements as the result of the seizure of a person without probable cause . . . the fruit of the poisonous tree doctrine requires that the evidence be suppressed as the product of the unlawful seizure. . . . Therefore, a two-part analysis is required: was the defendant seized; and, if so, was there probable cause for the seizure. . . . We have . . . defined a person as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Citations omitted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 404, 678 A.2d 1338 (1996).

"A person is not arrested or seized [however] . . . if he freely chooses to enter into or continue an encounter with the police. . . . Police officers do not violate an individual's constitutional rights by approaching him, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions. . . . Among the factors that may be considered in determining whether a defendant's encounter with police was consensual in nature are: the time, place and purpose of the encounter . . . ." (Citations omitted; internal quotation marks omitted.) Id., 405.

The following additional facts are necessary for the resolution of this claim. The defendant was approached at his mother-in-law's house by O'Leary, Ricci and Pelosi. The officers asked him if he would be willing to talk to them about the victim. The defendant assented and accompanied the officers to the police station. During the course of questioning at the police station, the defendant twice read his *Miranda* rights aloud, and was allowed free and unfettered movement throughout the station. While the entire duration of the defendant's questioning was eight and one half hours, up until the time when he confessed to the murder of the victim and thereafter was placed under arrest, the defendant was free to leave the police station. "This period, though substantial in duration, does not remotely approach the length of those interrogations held to be so objectionable . . . as to warrant reversal of a finding by a trial court that a confession was voluntary." *State* v. *Carter*, 189 Conn. 631, 638, 458 A.2d 379 (1983) (eight hour police interrogation). After the defendant confessed to the crime, the police arrested him and placed him in custody.

The questioning at the police station did not violate the defendant's constitutional rights. The defendant

accompanied the officers and answered questions. The defendant's confession was a voluntary response to police questioning and, thus, was properly admitted into evidence at trial.

"The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. . . . We have stated that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 418, 736 A.2d 857 (1999).

It is not at all clear from the record that the defendant's hearing impairment posed a problem for him during questioning by the police. The defendant was able to hear and respond to the officers' questioning, and there is no support for the claim that his confession was involuntary. We conclude that the court properly denied the defendant's motion to suppress.

The defendant's next claim is that the court improperly denied his motion in limine regarding the blood-stained towel. We disagree.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence

*tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Emphasis in original; internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 788–89, 699 A.2d 91 (1997), quoting *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995).

The defendant, in his confession, described to the police officers how he had wiped the victim's blood off the walls of her apartment with a towel. He then led the officers to the sewer in which he had thrown that towel. Contrary to the defendant's allegation, there is a clear nexus between the bloody towel, the crime committed and the defendant. The court committed no error in admitting the bloodstained towel into evidence.

The defendant's next claim that his confession should not have been allowed into evidence because it was inherently unreliable is without merit. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . . Most cases present only one, two, or three significant questions. . . . Usually . . . if you cannot win on a few major points, the others are not likely to help. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones." (Citations omitted; internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 51 Conn. App. 818, 822, 725 A.2d 971 (1999). The defendant's claim is just such a weak one. We refer to our previous discussion of the defendant's *Miranda* rights and the relevancy of evidence.

The defendant's final claim is that the court improperly failed to instruct the jury that it could consider the circumstances surrounding the taking of his statement. Because this claim was not preserved at trial, we apply the test set forth in *Golding*. See *State* v. *Golding*, supra

213 Conn. 239–40. The claim fails the second prong of *Golding* because it is not of constitutional magnitude. Id., 239. The failure of the court to instruct the jury as the defendant requested is not a constitutional issue because it related solely to the jury's consideration of a piece of evidence and was purely evidentiary in nature. The defendant has placed a constitutional tag on a nonconstitutional issue. See *State* v. *Smart,* 37 Conn. App. 360, 376, 656 A.2d 677, cert. denied, 233 Conn. 914, 659 A.2d 187 (1995).

The defendant's reliance on *State* v. *Huckabee,* 41 Conn. App. 565, 677 A.2d 452, cert. denied, 239 Conn. 903, 682 A.2d 1009 (1996), to support his contention that the jury should have been instructed that it was free to weigh the circumstances surrounding the taking of the defendant's statement is misplaced. The cited section in *Huckabee,* in fact, stands for the proposition that although a jury in a criminal trial may use evidence of prior misconduct to assess a defendant's credibility, the court must provide it with guidance on how to use that evidence. Id., 575. There was no issue of prior misconduct evidence in the present case. *Huckabee* is not applicable to the defendant's claim. The court properly instructed the jury with regard to the circumstances surrounding the defendant's confession.

The judgment is affirmed.

In this opinion the other judges concurred.