******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LOUIS SANCHEZ *v.* EDSON
MANUFACTURING ET AL.
(AC 38480)

Alvord, Sheldon and Mullins, Js.

*Syllabus*

The plaintiff appealed to this court from the decision of the Workers' Compensation Review Board affirming the decision of the Workers' Compensation Commissioner that the plaintiff was not entitled to certain
temporary partial or total disability benefits. The plaintiff, who had
undergone two prior surgeries on his left shoulder, claimed that he
injured that shoulder during his employment with the defendant manufacturer, E Co., when he moved a barrel and felt a pop in the shoulder.
Thereafter, an independent surgeon, S, who had been selected by E Co.,
examined the plaintiff and concurred with the determination by the
plaintiff's treating physician, O, that the plaintiff was suffering from a
fracture and lesions in his left shoulder. S, who did not have the plaintiff's
entire prior medical history when he examined the plaintiff, determined
that the fracture and lesions were not caused in the incident in which
the plaintiff moved the barrel, which he determined caused nothing more
than a temporary strain of the plaintiff's left shoulder. After obtaining
additional prior medical records of the plaintiff, S affirmed that finding
in a subsequent addendum to his medical report. After O examined the
plaintiff and recommended that a third surgery be performed on the
plaintiff's shoulder, the commissioner ordered the plaintiff to undergo
an examination by B, a surgeon chosen by the commissioner. B determined that the fracture and lesions in the plaintiff's left shoulder were
attributed to the barrel incident. The commissioner found that S's opinion was more persuasive than those of O and B, and concluded, inter
alia, that the plaintiff had injured his left shoulder in the course of his
employment for which he was entitled to receive certain temporary
total disability benefits, but that the fracture and lesions were not caused
by the barrel incident. The commissioner, thus, denied the plaintiff's
claim for certain temporary partial disability benefits. *Held*:

1. The board properly determined that the commissioner's findings concerning the cause and extent of the plaintiff's disability were supported by
sufficient underlying facts and that the inferences drawn from those
facts were reasonable and legally permissible:

a. The board did not err in finding that S provided a reasonable basis
for his opinion, which was supported by sufficient subordinate facts as
to constitute competent medical evidence on which the commissioner
properly could rely in making his findings; S physically examined the
plaintiff, performed a neurological assessment of him, reviewed medical
records from O and twice reviewed additional medical records that he
did not have at the time he examined the plaintiff, and S's written
opinion was not so contradicted by his deposition testimony as to
render it speculative or conjectural.

b. The plaintiff's claim that, because the medical examiners did not
testify before the commissioner, this court should depart from the
degree of deference usually afforded to the commissioner's credibility
determinations and determine the appropriate weight to afford the
opinions of the medical experts was unavailing; there was no reason
for this court to give less deference to the commissioner's credibility
determinations where, as here, the commissioner was not presented
with only written reports of nontestifying witnesses, and his credibility
determinations and findings were clearly influenced by the plaintiff's
live testimony that he never engaged in weightlifting or other forms of
physical exercise, which was directly contradicted by O's medical notes
and statements from the plaintiff's former coworkers.

2. The board did not abuse its discretion in not remanding the matter to
the commissioner for an articulation as to why the commissioner, in
rendering his decision, disregarded the opinion of B, the medical examiner chosen by the commissioner to examine the plaintiff; the board,
guided by the state regulation (§ 31-301-3) that governs the requisite

content of a commissioner's decision, determined that the commissioner's decision complied with the standard for decisions that do not rely on the opinion of a medical examiner chosen by the commissioner, and this court deferred to the board's interpretation and construction of its own regulation.

Argued February 6—officially released August 1, 2017

*Procedural History*

Appeal from the decision by the Workers' Compensation Commissioner for the Sixth District dismissing in part the plaintiff's claim for certain disability benefits, brought to the Workers' Compensation Review Board, which affirmed the commissioner's decision, and the plaintiff appealed to this court. *Affirmed.*

*Frank V. Costello*, with whom, on the brief, was *Austin Berescik-Johns*, for the appellant (plaintiff).

*Marian Yun*, for the appellees (defendants).

*Opinion*

SHELDON, J. The plaintiff, Louis Sanchez, appeals from the decision of the Workers' Compensation Review Board (board) affirming the decision of the Workers' Compensation Commissioner for the Sixth District (commissioner), who dismissed, in part, his claim for workers' compensation benefits pursuant to General Statutes §§ 31-307 and 31-308 (a). On appeal, the plaintiff claims that the board erred (1) in affirming the commissioner's decision that the plaintiff was not entitled to temporary partial or temporary total disability benefits from August, 2013 to July, 2014, because the commissioner's finding as to the nature and extent of the plaintiff's workplace injury was not supported by sufficient subordinate facts; and (2) in not remanding this case to the commissioner with instructions that he articulate why, in reaching his decision, he disregarded the opinion of his own medical examiner as to the nature and extent of the plaintiff's injury. We affirm the decision of the board.

The following facts and procedural history are relevant to this appeal. In 1992, the plaintiff was hired by Celus Fasteners, a Massachusetts manufacturer, where he worked for approximately sixteen years making rivets. When Celus Fasteners went bankrupt, the plaintiff took a job with Metz Personnel (Metz), also in Massachusetts, where he worked as a laminator. On July 23, 2008, while working for Metz, the plaintiff tripped and fell, landing on his left shoulder. Following his fall, the plaintiff began to experience sharp pains in his shoulder. Although the plaintiff was given a cortisone injection for his shoulder injury and underwent a course of physical therapy, his shoulder pain persisted for several months. Thus, in March, 2009, the plaintiff consulted with an orthopedic surgeon, Dr. Ergin,[1] about the advisability of undergoing surgery on his left shoulder joint. After examining the plaintiff, however, Ergin concluded that surgery on the plaintiff's left shoulder joint was unnecessary. Instead, Ergin gave the plaintiff two additional cortisone injections and instructed him to seek a second opinion if he wanted to pursue surgery.

In accordance with Ergin's instructions, the plaintiff consulted with and was examined by James D. O'Holleran, an orthopedic surgeon. After reviewing a magnetic resonance imaging (MRI) scan of the plaintiff's shoulder, O'Holleran opined that the plaintiff was suffering from a torn rotator cuff, AC joint arthrosis, and a superior labral tear in his left shoulder, for which he recommended that the plaintiff undergo surgery. O'Holleran performed the recommended surgery on June 5, 2009. Almost six months later, after the plaintiff completed another course of physical therapy, O'Holleran gave him a medical release to return to full work duties on November 18, 2009.

Thereafter, the plaintiff took a new job with Charm Sciences, another Massachusetts manufacturer, for which he mixed commercial grade chemicals. While working at Charm Sciences on December 30, 2009, the plaintiff reinjured his left shoulder when lifting a forty pound box. As a result of this reinjury, the plaintiff experienced "difficulty reaching behind his shoulder as well as . . . overhead." The following week, the plaintiff was reexamined by O'Holleran, who gave him another cortisone injection, placed him on a light duty work restriction, and recommended that he undergo an additional six weeks of physical therapy. On March 22, 2010, when the plaintiff was reexamined by O'Holleran after he had completed the recommended course of physical therapy, he reported that his shoulder had experienced "a dramatic improvement . . . ." Accordingly, the plaintiff requested that O'Holleran give him a release to return to full work duty and a clearance "to do some weight training and lifting." O'Holleran gave the plaintiff a release to return to full work duty and instructed him to return "on an as-needed basis."

On June 2, 2011, the plaintiff returned to O'Holleran, complaining of persistent pain in his left shoulder. O'Holleran gave the plaintiff another cortisone injection and instructed him to undergo additional physical therapy. These conservative treatments proved to be unsuccessful, however, and the plaintiff remained unable to return to work throughout July, 2011. Thereafter, the plaintiff underwent another MRI scan on August 31, 2011. On September 15, 2011, when O'Holleran reviewed the new MRI scan with the plaintiff, he opined that, although the plaintiff had not suffered a new tear in his left shoulder, there was "a high degree of [inflammation] within the tissue inside the AC joint." After discussing several treatment options with O'Holleran, the plaintiff elected to undergo a second surgery for shoulder arthroscopy, lysis of adhesions, and debridement,[2] which O'Holleran performed on February 28, 2012. Although the second surgery was performed without complication, the plaintiff remained unable to work for several months thereafter.

In April, 2013, the plaintiff was employed by the defendant Edson Manufacturing,[3] a Connecticut manufacturer, as a mechanic and machine operator. As part of his duties, the plaintiff used a dolly[4] to bring barrels of nails to the company's rivet-making machines and to transport finished rivets to other locations in the factory after they were made. While working on April 15, 2013, the plaintiff prepared to move a barrel of stainless steel nails weighing approximately 100 pounds. To do so, he first positioned himself behind the dolly and barrel, then, with his right hand on the back of the dolly, reached out with his left arm and placed his left hand on the rim of the barrel. Then, with his left hand gripping the rim of the barrel, the plaintiff

pulled the barrel of nails toward his chest until he felt a sudden "pop" in his left shoulder. The plaintiff did not inform anyone of his injury at the time he sustained it, nor did he request time off from work after he finished his shift that day. Rather, he continued to work for the defendant, without complaint, for the next eleven days, until he was laid off on April 26, 2013.

Because the layoff was supposed to be temporary, the plaintiff intended to return to his job with the defendant when it was over. On May 20, 2013, the defendant notified the plaintiff, by text message, that he could return to work. The plaintiff responded by text message that he would return to work the following Monday. The defendant's offer later was retracted, however, due to an unexpected delay in receiving certain materials and supplies.

Two days later, on May 22, 2013, thirty-seven days after the plaintiff suffered his workplace injury, he went to the emergency room of Lawrence General Hospital in Lawrence, Massachusetts, complaining of pain in his left shoulder. Thereafter, the plaintiff was referred back to O'Holleran, who examined him on May 24, 2013. During that examination, the plaintiff stated that he had been experiencing "significant worsening pain" in his left shoulder since the date of his injury, which had caused him to be unable to sleep or to perform overhead activities without pain. Accordingly, O'Holleran ordered another MRI scan of the plaintiff's left shoulder and gave him documentation stating that he would be unable to return to work until he was reevaluated.

On July 9, 2013, the plaintiff filed a form 30C notice of his workers' compensation claim.[5] On July 7, 2013, more than seventy days after the date of his workplace injury, the plaintiff informed the defendant, for the first time, that he had suffered a shoulder injury while working on April 15, 2013. After receiving the plaintiff's form 30C, the defendant requested, pursuant to General Statutes § 31-294f (a),[6] that an independent medical examination of the plaintiff be conducted in order to assist it in determining whether to accept or contest the plaintiff's workers' compensation claim.

Prior to that examination, on June 8, 2013, the plaintiff underwent another MRI scan at the request of O'Holleran. On August 8, 2013, the plaintiff met with O'Holleran to discuss his findings. After reviewing the MRI scan, O'Holleran opined that the plaintiff had not aggravated a previous injury to his left shoulder on April 15, 2013, but, instead, had sustained a new injury— an anterior glenoid fracture with a bony Bankart lesion[7] and a Hill-Sachs lesion.[8] O'Holleran then noted, "I feel that his fracture fragment is in very good position and does not need surgery at this time. Given that his original injury was in April, I feel that [the] fragment has essentially healed. He still certainly has the labral tear and he certainly has pain. . . . I have recommended a

course of physical therapy . . . . Regarding work, he will be cleared for light duty with no lifting greater than [ten] pounds." On September 11, 2013, however, O'Holleran changed that work restriction by ordering that the plaintiff not return to work until he was reevaluated. He later reaffirmed that total work restriction on October 23, 2013.

On September 25, 2013, the plaintiff was examined by Steven E. Selden, an orthopedic surgeon selected by the defendant as its independent medical examiner. During that examination, the plaintiff informed Selden that, on April 15, 2013, "he was moving a barrel [when he] felt a pop in his left shoulder . . . [but] he did not feel any actual pain." After reviewing O'Holleran's May 24, 2013 notes and the June 8, 2013 MRI scan that O'Holleran had ordered, Selden noted that the plaintiff had sustained a prior shoulder injury in 2009, in connection with which he had undergone a "*posterior capsular shift* and distal clavicle excision." (Emphasis added.) Selden concurred with O'Holleran that the plaintiff was then suffering from a Hill-Sachs lesion and a bony Bankart lesion in his left shoulder. He did not agree, however, that this injury had occurred on April 15, 2013. Rather, he opined that "[the plaintiff] may have sustained a strain of his left shoulder as a result of moving a barrel . . . but he has a significant preexisting condition to his left shoulder for which he had two surgical procedures. It would be very helpful to have Dr. O'Holleran's notes regarding prior treatment for the left shoulder. Certainly, the [plaintiff's] Bankart lesion and Hill-Sachs lesion clearly preexisted April of 2013 based on the history reviewed. A course of physical therapy at this time would be appropriate." Selden further opined that the plaintiff was not totally disabled but, instead, was capable of light duty work "with avoidance of lifting more than [twenty-five] pounds and . . . overhead reaching and lifting."

On December 23, 2013, O'Holleran reexamined the plaintiff a final time. During that examination, the plaintiff maintained that he was still experiencing persistent pain in his left shoulder, and thus he requested that a third surgery be performed. In light of the plaintiff's repeated history of cortisone injections, use of anti-inflammatories, and physical therapy, none of which had yet proved to be successful, O'Holleran recommended that a third surgery be performed on the plaintiff's left shoulder.

Thereafter, the commissioner directed the plaintiff, pursuant to § 31-294f (a), to submit to another medical examination by an independent medical examiner of the commissioner's own choosing, Dr. Peter R. Barnett. After performing that examination on April 14, 2014, Barnett noted: "Currently, the [plaintiff] feels that his left shoulder complaints have worsened. . . . The [plaintiff] . . . complains of numbness and tingling cir-

cumferentially throughout the entire left upper extremity, intermittently present both during the day and at night since the injury." After reviewing the plaintiff's medical records, Barnett opined: "It is my impression based on information currently available that [the plaintiff's] bony Bankart lesion and Hill-Sachs lesion [are] attributable to the alleged work-related incident . . . on April 15, 2013." Barnett further opined that, although the plaintiff had not yet reached maximum medical improvement, he was capable of limited work duty with restrictions against lifting or reaching overhead, repetitive use of the left arm, and lifting more than fifteen pounds.

On July 14, 2014, the commissioner held a formal hearing on the plaintiff's claims (1) for total incapacity benefits from June 24 to August 8, 2013; (2) for temporary partial benefits from August 9 to October 23, 2013; and (3) for total incapacity benefits from October 24, 2013 to July 14, 2014. At that hearing, the plaintiff testified and produced documentary evidence, including MRI scans, the medical records of O'Holleran, Selden and Barnett, and transcripts of O'Holleran's and Selden's depositions. In response, the defendant produced, inter alia, a July 14, 2014 addendum to Selden's medical report, wherein Selden stated that, although he had reviewed additional medical records pertaining to the plaintiff, he still believed that the plaintiff's April 15, 2013 injury did not cause his glenoid fracture and lesions. The defendant also submitted copies of certain text messages between the plaintiff and his manager, several documents regarding the plaintiff's two prior workers' compensation claims for injuries to his left shoulder, and several statements from the plaintiff's former coworkers describing past conversations with the plaintiff, in which he had told them that he routinely did pushups in the morning before going to work.

On January 5, 2015, the commissioner issued a written decision, in which he found, inter alia, that (1) the plaintiff had not informed either his employer or his coworkers of his workplace injury, or reported that he had any difficulty performing his job duties after the injury; (2) there was "[c]onflicting testimony . . . as to the [plaintiff's] weightlifting activities" around the date of his injury; (3) Selden disagreed with the mechanism of injury, opining that the April 15, 2013 incident had "caused nothing more than a temporary, self-limited strain of [the plaintiff's] left shoulder"; and (4) as to the extent of the plaintiff's disability caused by his April 15, 2013 injury and resulting need for further medical treatment, Selden's opinions were more persuasive than those of O'Holleran and Barnett. On the basis of those findings, the commissioner concluded that the plaintiff had sustained a left shoulder injury in the course of his employment, for which he was entitled to receive "temporary total benefits for the period of June 24, 2013 through August 8, 2013." The commis-

sioner disagreed, however, that the April 15, 2013 incident had caused either the plaintiff's anterior glenoid fracture or his accompanying lesions. Instead, the commissioner adopted Selden's opinion that on April 15, 2013, the plaintiff had suffered a shoulder sprain, and thus that "any [current] restrictions or limitations on his ability to work were unrelated to the April 15, 2013 injury." On those grounds, the commissioner denied the plaintiff's claims for temporary partial benefits for the period from August 9 to October 23, 2013, and for temporary total benefits for the period from October 24, 2013 to July 14, 2014.

On February 18, 2015, the plaintiff appealed from the commissioner's decision to the board, claiming that the commissioner had "erred in finding . . . Selden to be more persuasive than . . . O'Holleran and Barnett on the issues of extent of disability and medical treatment." In his accompanying brief, the plaintiff argued that Selden had formed his opinion as to causation and extent of disability without first reviewing the plaintiff's medical records concerning the treatment of his prior shoulder injury from 2009 through 2012. As a result, he argued, Selden was unaware that the plaintiff's prior injury was to the *posterior* labrum, whereas the April 15, 2013 injury here at issue was to his *anterior* labrum. The plaintiff thus argued that "[b]ecause . . . Selden did not have sufficient subordinate facts to render an opinion [to a reasonable degree of medical probability], the commissioner erred in relying on his testimony." Last, the plaintiff claimed that the commissioner did not adequately articulate why he had disregarded the opinion of Barnett, his own medical examiner, in making his findings and issuing his award in this case. On those grounds, the plaintiff requested that the board reverse the commissioner's decision and find that the plaintiff was entitled to benefits "from August 8, 2013, to the present and continuing until a form 36 is approved."

On June 26, 2015, the board held a hearing on the plaintiff's claims. On October 6, 2015, it issued a written decision affirming the commissioner's decision. In so doing, the board found, inter alia, that (1) Selden had offered a reasonable basis for his medical opinions as to causation; (2) the commissioner's findings were supported by adequate subordinate facts; (3) the commissioner correctly applied the law to the facts found; and (4) the commissioner's written decision "complie[d] with the standard we have delineated for a decision which does not rely on the opinion of the commissioner's examiner." Thereafter, the plaintiff filed the present appeal. Additional facts will be set forth as necessary.

I

On appeal, the plaintiff first claims that the board erred in affirming the commissioner's decision because the commissioner's findings regarding the cause and extent of the plaintiff's disability were not supported

by sufficient subordinate facts. In support of his argument, the plaintiff asserts that Selden had formed his opinion as to the cause and extent of the plaintiff's disability before he had reviewed the plaintiff's medical records regarding the prior injuries to and corresponding treatments for his left shoulder. The plaintiff argues that, without first acquainting himself with the plaintiff's entire medical history, Selden's opinion that the plaintiff's fracture and lesions preexisted the April 15, 2013 injury was the product of speculation and conjecture, and thus his opinion could not be stated to a reasonable degree of medical probability. Therefore, the plaintiff argues, the commissioner's decision, which relied heavily on Selden's opinion, was based on speculation and conjecture. In the alternative, the plaintiff argues that because none of the medical examiners in this case testified before the commissioner at the July 14, 2014 formal hearing, this court is not obligated to defer to the commissioner's credibility determinations and, instead, should conclude that the commissioner erred by not adopting the more persuasive opinions of O'Holleran and Barnett. See *Bode* v. *Connecticut Mason Contractors*, *The Learning Corridor*, 130 Conn. App. 672, 25 A.3d 687, cert. denied, 302 Conn. 942, 29 A.3d 467 (2011).

The defendant disagrees, asserting that the board deferred appropriately to the commissioner's factual findings and credibility determinations. In support of its argument, the defendant argues that causation is a question of fact and, if presented with conflicting medical testimony, the commissioner has the sole discretion to determine whose opinions to credit and what weight to give to such opinions. Therefore, the defendant argues, the board correctly held that it could not reject the commissioner's finding that Selden's opinion was more persuasive than those of O'Holleran and Barnett. The defendant further argues that the board correctly held that Selden offered a reasonable basis for his opinions on causation and that, unlike the medical expert in *DiNuzzo* v. *Dan Perkins Chevrolet Geo*, *Inc.*, 294 Conn. 132, 982 A.2d 157 (2009)—a case upon which the plaintiff relies for his argument that Selden's opinion was the product of speculation and conjecture—Selden physically examined the plaintiff and, on two separate occasions, reviewed additional medical information prior to submitting the July 14, 2014 addendum to his report, wherein he affirmed his original opinion that the plaintiff suffered a shoulder sprain on April 15, 2013. The defendant thus argues that the board did not abuse its discretion in affirming the commissioner's decision. We agree with the defendant.

The following additional facts, as presented to the commissioner, are relevant to this claim. As discussed in the preceding paragraphs, the commissioner was presented with the plaintiff's live testimony and documentary evidence of the plaintiff's medical history and

examinations. In his testimony, the plaintiff was asked, and he answered, several questions as to whether he exercised or lifted weights around the date of his injury. The plaintiff denied that he had ever engaged in weightlifting, exercising at a gym, or even exercising at home. Moreover, the plaintiff denied that he had ever asked O'Holleran to provide him with a medical release so that he could resume weightlifting. The defendant challenged this testimony by submitting statements from three of the plaintiff's former coworkers, describing separate conversations with the plaintiff, in which he had told them that he did pushups and sit-ups every day before going to work. In one such conversation, a coworker recalled that the plaintiff had bragged about "how easy [his job] was because 'he was used to doing 200 pushups and 200-300 sit-ups among other exercises every morning before work' . . . ."

The documentary evidence presented at the formal hearing included, inter alia, O'Holleran's February 27, 2014 deposition. At the deposition, O'Holleran testified that he had reviewed his notes from the years 2009 to 2013, as well as MRI scans and X-rays he had ordered of the plaintiff's shoulder. On the basis of those records, O'Holleran opined, inter alia, that the incident on April 15, 2013, had caused the glenoid fracture, the bony Bankart lesion and the Hill-Sachs lesion in the plaintiff's left shoulder; this injury was unrelated to the plaintiff's prior shoulder surgeries in 2009 and 2012; the plaintiff had not yet reached maximum medical improvement following his April 15, 2013 injury; and, in light of the fact that the plaintiff had exhausted all conservative treatment options for his shoulder, surgery would be the next logical step, after which the plaintiff would need approximately nine months to fully recover.

In explaining the basis for his opinions, O'Holleran stated that the plaintiff's present fracture and lesions were in the anterior portion of the labrum, and thus could not have been an aggravation of the plaintiff's prior injury, which was to his posterior labrum; the plaintiff's report of feeling a "pop" at the time he was injured was consistent with experiencing a glenoid fracture and a labral tear; and, although a recent MRI scan showed that the fracture had healed, it was likely that the plaintiff's labrum was still torn, and that the tear was causing the plaintiff's pain. Last, O'Holleran noted the presence of bone marrow edema[9] in the plaintiff's shoulder, which was consistent with a recent injury to his shoulder joint.

O'Holleran's testimony, however, was not unqualified. Thus, as to the mechanism of the plaintiff's injury, O'Holleran conceded: "I have zero opinion as to whether or not he truly injured his shoulder as he said he did at work. . . . I wasn't there . . . . I can only go by what the patient tells me in the office." Moreover, after he was asked to assume that the plaintiff had

operated the dolly in a conventional manner, O'Holleran conceded that it would have been uncommon for such activity to cause this type of injury. O'Holleran further conceded that a glenoid fracture that causes a bony Bankart lesion and Hill-Sachs lesion is a painful injury, and that it was "unusual" for the plaintiff to have waited five weeks before seeking medical treatment. Regarding the current status of the plaintiff's injury, O'Holleran agreed that the recent scans showed that the fracture had healed, but stated both that he would be unable to determine the extent of the injury until he performed an incision on the shoulder joint, and that he lacked objective evidence to explain the plaintiff's current neurological complaints. As to the benefits of undergoing a third surgery, O'Holleran stated: "I think, given [that] he has not improved in [ten] months, and . . . assuming that his condition hasn't changed, I think [that] it's unlikely he's going to get much better." Last, when asked about the March 22, 2010 note regarding the plaintiff's desire to return to weightlifting and exercising, O'Holleran stated that, although he had no independent recollection of the plaintiff's exercise habits, he did not believe that the note was a mistake.

Selden's deposition occurred on December 2, 2013. At his deposition, Selden testified that, prior to forming his opinions, he had physically examined the plaintiff, performed a neurological assessment of him, and reviewed O'Holleran's May 24, 2013 notes as well as the June 8, 2013 MRI scan that O'Holleran had ordered. Selden further testified that, after his September 25, 2013 examination of the plaintiff but before he gave his deposition, he had received and reviewed additional medical records for the plaintiff.[10] When questioned as to the results of the June 8, 2013 MRI scan, Selden acknowledged that it showed a glenoid fracture as well as a bony Bankart lesion and a Hill-Sachs lesion. He maintained, however, that this injury had not occurred on April 15, 2013. Selden explained that his opinion was based on two factors: (1) the mechanism of injury, as described by the plaintiff, was inconsistent with causing a glenoid fracture; and (2) the plaintiff's claim that he did not feel any pain when he sustained the injury was inconsistent with sustaining a glenoid fracture. As to the mechanism of injury, Selden testified that "lifting a barrel, whether it's manually . . . or using . . . some type of dolly, is inconsistent with fracturing your glenoid. . . . It's the wrong mechanism to cause a fracture." As to the amount of pain the plaintiff reportedly felt at the time of his injury, moreover, Selden testified, "I have not seen anybody with a glenoid fracture that didn't have significant pain in their shoulder, as with any fracture around the shoulder. That's a painful injury. I've personally not [seen] any patients with fractures such as that, and I've seen lots over the years, who have not had significant pain."

On those grounds, Selden opined, inter alia, that the

plaintiff likely suffered a shoulder strain on April 15, 2013; given the plaintiff's history of shoulder injuries, a sprain of this nature would have healed within approximately six to eight weeks; notwithstanding such a shoulder sprain, the plaintiff would have retained a light duty work capacity, and should have reached maximum medical improvement within six months of the date of the injury; there was no discernible reason for additional surgery on the shoulder; and he did not believe that the plaintiff's current complaints of persistent pain and numbness were connected to the April 15, 2013 work injury because the plaintiff did not complain of, nor did Selden observe any evidence that he was experiencing, any numbness or nerve damage when he performed his neurological examination of the plaintiff.

Selden's testimony, like O'Holleran's, was not unqualified. When asked his opinion as to what had occurred when the plaintiff felt the "pop" in his shoulder, Selden opined that the plaintiff had either subluxed[11] his shoulder or felt the breaking of adhesions or residual scar tissue from his prior surgery. Thereafter, Selden agreed that the subluxation of the shoulder joint can cause a glenoid fracture resulting in Bankart lesions or Hill-Sachs lesions. He maintained, however, that the mechanism of injury and the amount of pain experienced on April 15, 2013, were inconsistent with sustaining a glenoid fracture.

In addition to these deposition transcripts, the plaintiff submitted the April 14, 2014 written report of Barnett, the commissioner's medical examiner. In that report, Barnett noted that he had reviewed O'Holleran's notes for the period from 2009 to 2013, as well as several X-rays and MRI scans performed between 2011 and 2013. He then noted that the plaintiff had stated that "he was *pushing* with his left arm when he felt a popping sensation and mild pain." (Emphasis added.) Barnett subsequently diagnosed the plaintiff as suffering from an anterior-inferior bony Bankart lesion *and a posterior*-superior bony Hill-Sachs lesion, further noting the presence of bone marrow edema in the plaintiff's shoulder. On the basis of those findings, Barnett opined: "It is my impression based on information currently available that [the plaintiff's] bony Bankart lesion and Hill-Sachs lesion is attributable to the alleged work-related incident . . . on April 15, 2013. There is no indication that either of these problems was present at the time of his prior surgical procedures or prior care for the shoulder." He further noted that, "[a]t this juncture surgical intervention on the left shoulder would not be recommended. . . . [I]t is recommended that the [plaintiff] undergo a neurologic assessment . . . to determine the cause and origin of the [plaintiff's] non-specific neurologic complaints . . . ."

Last, on the day of the formal hearing, the defendant submitted an addendum to Selden's report, dated July

14, 2014, wherein Selden stated, "I have reviewed additional medical records provided regarding [the plaintiff].[12] It remains my opinion that [the plaintiff] sustained a strain of his left shoulder as a result of moving a barrel on [April 15, 2013]. . . . It is my opinion that the incident of [April 15, 2013] caused nothing more than a temporary, self-limited strain of his left shoulder . . . [and] that any limitations on his ability to work at this time are unrelated to the incident of [April 15, 2013]. (Footnote added.)

In summarizing the commissioner's findings, the board recalled that the commissioner had "noted that the medical evidence in this claim was disputed, and there was inconsistency between the [plaintiff's] narrative as to his exercise regimen and the reports of his treating physician." Thereafter, the board held that, in light of Selden's examination and conclusions, as confirmed by his July 14, 2014 addendum, "the opinions that [Selden] provided in this case were . . . competent evidence that the trial commissioner could reasonably rely upon. To the extent the initial opinions rendered by [Selden] had deficiencies, we believe that they were sufficiently clarified by the addendum submitted . . . to constitute a reliable expert opinion." Thus, the board held that the commissioner's conclusion "[was] consistent with a medical opinion he found persuasive and reliable." With these additional facts in mind, we turn to the merits of the plaintiff's claims.

A

We first address the plaintiff's argument that Selden's opinion was not competent medical evidence supported by sufficient subordinate facts, and thus that the commissioner's decision, which relied heavily on that opinion, was based on speculation and conjecture. The gravamen of the plaintiff's argument is that Selden was unaware, when formulating his opinions, that the plaintiff's prior injuries were to the *posterior* labrum—whereas his current injury was to the *anterior* labrum—and that his written opinion was directly contradicted by his subsequent deposition testimony. We are unpersuaded.

"[W]e first set forth our standard of review for workers' compensation appeals. The commissioner is the sole trier of fact and [t]he conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . The review [board's] hearing of an appeal from the commissioner is not a de novo hearing of the facts. . . . [I]t is [obligated] to hear the appeal on the record and not retry the facts. . . . On appeal, the board must determine whether there is *any evidence*[13] in the record to support the commissioner's findings and award. . . . Our scope of review of [the] actions of the [board] is [simi-

larly] . . . limited. . . . [However] [t]he decision of the [board] must be correct in law, and it must not include facts found without evidence or fail to include material facts which are admitted or undisputed." (Emphasis added; footnote added; internal quotation marks omitted.) *Mahoney* v. *Bill Mann Tree Service, Inc.*, 67 Conn. App. 134, 136, 787 A.2d 61 (2001).

"A commissioner's conclusion regarding causation is conclusive, provided it is supported by competent evidence and is otherwise consistent with the law." (Citation omitted.) *Dengler* v. *Special Attention Health Services, Inc.*, 62 Conn. App. 440, 451, 774 A.2d 992 (2001). Moreover, "[i]t matters not that the basic facts from which the [commissioner] draws this inference are . . . controverted. . . . It is likewise immaterial that the facts permit the drawing of diverse inferences. The [commissioner] alone is charged with the duty of initially selecting the inference which seems most reasonable and [the commissioner's] choice, if otherwise sustainable, may not be disturbed by a reviewing court." (Internal quotation marks omitted.) *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 36, 787 A.2d 541 (2002). "[T]here must [however] be subordinate facts from which the conclusion that there is a causal connection between the employment and the injury can be drawn. . . . [Thus, the] right of a claimant to compensation must be based [on] more than speculation and conjecture." (Internal quotation marks omitted.) *DiNuzzo* v. *Dan Perkins Chevrolet GEO, Inc.*, supra, 294 Conn. 143. Accordingly, "[a]lthough . . . the board is prohibited from retrying the case or substituting its inferences for those drawn by the commissioner, the board certainly [is] free to examine the record to determine whether competent evidence supported the commissioner's findings, inferences drawn from such findings and conclusions." *Dengler* v. *Special Attention Health Services, Inc.*, supra, 450.

In the present case, the plaintiff argues that the commissioner's findings were not supported by competent medical evidence because, at the time he formed his opinions, Selden was unaware that the plaintiff's prior injuries involved the plaintiff's anterior labrum, not the posterior labrum. The plaintiff thus argues, citing *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, supra, 294 Conn. 132, that, without knowing the entirety of the plaintiff's prior medical history, Selden's opinion on causation and extent of disability amounted to mere speculation and conjecture, and thus "there were insufficient subordinate facts in the record to support the commissioner's finding"; id., 143; which was predicated on Selden's expert testimony.

After carefully reviewing the record in this case, we conclude that the board did not err in determining that Selden offered a reasonable basis for his opinion, and thus that the commissioner's decision, which relied

upon that opinion, was supported by sufficient subordinate facts to require that it be affirmed. First, in his September 25, 2013 report, Selden specifically noted that he had reviewed the plaintiff's past medical history, which revealed that, in 2009, the plaintiff had injured his shoulder and "underwent a *posterior* capsular shift and distal clavicle excision. He did not do well and had a second surgery in June of 2012. He underwent lysis of adhesions." (Emphasis added.) Thereafter, during his December 2, 2013 deposition, Selden agreed with the statement by the defendant's counsel that he reviewed "a couple of additional medical records from the past which [he] did not have" at the time of his examination. Last, in his July 14, 2014 addendum, Selden again reported that he had reviewed additional medical records, but that his opinion remained unchanged: the April 15, 2013 incident had caused nothing more than a shoulder strain, and any current limitations on the plaintiff's ability to work were unrelated to that incident. Looking at "the entire substance of the expert's testimony"; *O'Reilly* v. *General Dynamics Corp.*, 52 Conn. App. 813, 817, 728 A.2d 527 (1999); it is apparent that Selden was aware that the plaintiff's 2009 injury was to the posterior labrum and that, after personally examining the plaintiff, reviewing his past medical history, and twice reviewing additional medical reports, his opinion remained constant.

For that reason, we conclude that the board correctly determined that Selden's opinions were unlike those of the claimant's medical examiner in *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, supra, 294 Conn. 132. In *DiNuzzo*, the decedent's spouse "submitted a claim for dependent widow's benefits pursuant to . . . [General Statutes] § 31-306." (Internal quotation marks omitted.) Id., 134. In support of her claim, the claimant submitted a medical report prepared by the decedent's physician, in which the doctor "stated that the cause of [the decedent's] death was heart disease, secondary to atherosclerotic heart disease . . . brought about by the curtailment of his physical activities . . . [and that the decedent's prior] compensable injury and its treatment substantially contributed to his death . . . because they severely limited his ability to maintain his physical fitness and aerobic conditioning." (Internal quotation marks omitted.) Id., 135. Thereafter, the commissioner in *DiNuzzo* found "that there was a relationship between the compensable injury and the decedent's death . . . [and, on that basis,] concluded that the plaintiff was entitled to benefits pursuant to § 31-306." (Internal quotation marks omitted.) Id., 136.

On appeal in *DiNuzzo*, our Supreme Court affirmed the judgment of this court, which reversed the board's affirmance of the commissioner's decision. In so doing, the *DiNuzzo* court noted that the medical examiner, upon whose opinion the commissioner had relied, had made the following concessions of fact which under-

mined his opinion: (1) the decedent had not been diagnosed with atherosclerotic heart disease; (2) the medical examiner was unaware that "the decedent had been hospitalized approximately one month before his death for certain side effects of Interferon"; id., 145; (3) the symptoms exhibited by the decedent shortly before his death "could have been the result of his use of Interferon"; id.; and (4) because he did examine the decedent's body postmortem, "it would be impossible to know whether the heart attack could have been prevented if the decedent had been able to exercise more because some heart attacks are caused by congenital heart defects that are not amenable to improvement through exercise." Id., 146. The court then noted that, aside from this unsupported medical opinion, "the plaintiff produced no evidence linking the decedent's death to a heart attack." Id., 144. Accordingly, the court held that that medical opinion amounted to no more than speculation and conjecture, and thus "the causal link between his compensable injury and his alleged manner of death simply [became] too attenuated to support a reasonable inference that the two events were connected." Id., 148.

Here, unlike the medical examiner in *DiNuzzo*, Selden physically examined and performed a neurological assessment of the plaintiff, reviewed O'Holleran's May, 2013 medical notes, the June 8, 2013 MRI scan, which O'Holleran had ordered, and twice reviewed additional medical records concerning the plaintiff's prior shoulder injuries. In light of these facts, the commissioner in this case had far more evidence on the record before him to substantiate Selden's opinion as to the nature and extent of the plaintiff's injury than the medical examiner whose opinion was rejected as speculative and conjectural in *DiNuzzo*. See id., 145–48. Because Selden provided a reasonable basis for his opinion, that opinion was competent medical evidence supported by sufficient underlying facts to justify the commissioner's reliance upon it in reaching his decision in this case.

Last, we are not persuaded by the plaintiff's argument that Selden's written report was so contradicted by his deposition testimony, or that any inconsistencies between the report and the deposition were so substantial, as to make it inappropriate for the commissioner to rely on the report in making his findings in this case. Although the plaintiff correctly notes that Selden testified that he believed that the plaintiff may have subluxed his shoulder on April 15, 2013, and that a shoulder subluxation can result in a glenoid fracture, there are two fundamental flaws in the plaintiff's argument. First, Selden testified that the "pop" in the plaintiff's shoulder *could* have been *either* a subluxation *or* a tearing of preexisting adhesions and scar tissue, either of which could have caused the plaintiff's shoulder strain without causing the glenoid fracture. Second, the plaintiff fails to acknowledge that, even if he did sublux

his shoulder on April 15, 2013, and a subluxation can cause a glenoid fracture, those possibilities do not compel a finding that the particular subluxation, if any, that occurred on April 15, 2013, is what caused the glenoid fracture. Instead, both Selden and the commissioner reasonably could have concluded that the plaintiff, who claimed to have routinely done 200 pushups per day, sustained a second subluxation that caused the glenoid fracture after the date of his workplace injury on April 15, 2013, but before he went to the hospital on May 22, 2013. We thus cannot find that Selden's written opinion was so squarely contradicted by his deposition testimony as to render his opinion speculative or conjectural.

"Once the commissioner makes a factual finding, [we are] bound by that finding if there is evidence in the record to support it. . . . Similarly, the conclusions drawn by the commissioner from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . It [is] within the commissioner's discretion to credit all, part or none of the . . . [expert] testimony. That determination cannot be overruled by the board unless it could not find *any evidence* to support the conclusion." (Citations omitted; emphasis added; internal quotation marks omitted.) *O'Reilly* v. *General Dynamics Corp.*, supra, 52 Conn. App. 818–19. In light of the foregoing analysis, we agree with the board that Selden's opinion was supported by sufficient subordinate facts to constitute competent medical evidence upon which the commissioner properly could rely in making his findings in this case. We thus conclude that the board correctly determined that the commissioner's findings were supported by sufficient underlying facts to uphold them, and that any inferences drawn from such facts were reasonable and legally permissible. See, e.g., *Blakeslee* v. *Platt Bros. & Co.*, 279 Conn. 239, 243, 902 A.2d 620 (2006).

B

Notwithstanding our conclusion that the commissioner's findings were supported by sufficient underlying facts, the plaintiff argues, in the alternative, under *Bode* v. *Connecticut Mason Contractors, The Learning Corridor*, supra, 130 Conn. App. 672, that this court should depart from the degree of deference usually afforded to the commissioner's credibility determinations and conclude that the commissioner erred in not adopting the opinions of O'Holleran and Barnett. This is so, the plaintiff argues, because none of the medical examiners gave live testimony before the commissioner at the July, 2014 formal hearing; rather, each examiner submitted a written report concerning his own medical evaluation of the plaintiff. The plaintiff argues that, under these circumstances, the commissioner's credibility determinations were not influenced by the live

testimony of those witnesses, and thus this court is equally capable of determining the appropriate weight to afford the opinions of Selden, O'Holleran and Barnett. We disagree and conclude that the defendant's reliance on *Bode* is misplaced.

In *Bode*, the claimant sought temporary total disability benefits for fractures to his spine and shoulder that he sustained in 2002, after falling thirty feet from scaffolding. Id., 674. Although the claimant submitted a number of medical records in support of his claim, "[n]one of the physicians opined that the [claimant] was totally disabled or unable to work on or after April 26, 2005." Id., 676. In addition to these reports, the claimant submitted four vocational evaluations. Although the first two evaluations, performed in October, 2003, and January, 2004, had concluded that the claimant was " 'presently employable,' " the last two evaluations, which were performed in August, 2004, and July, 2008, had concluded that "due to his worsening condition the [claimant] was completely unemployable." Id., 677. In January, 2009, the commissioner dismissed the claimant's request for disability benefits. Id., 678. Thereafter, the board affirmed the commissioner's finding, concluding, inter alia, that "the [claimant] failed to meet his burden of proving eligibility for temporary total disability benefits because . . . he did not introduce one medical report in which a physician opined that [he] was totally disabled . . . . [Thus] because this board is not empowered to overturn a trier's evidentiary determinations unless they lack foundation in the record . . . the trial commissioner's decision . . . must stand." (Internal quotation marks omitted.) Id.

On appeal in *Bode*, the claimant argued that the board had improperly affirmed the commissioner's decision because, inter alia, the commissioner "arbitrarily disregarded . . . the uncontroverted vocational expert opinions . . . ." Id., 679. This court agreed and reversed the decision of the board. Id. In so doing, the court in *Bode* acknowledged that the claimant had not introduced a single medical report establishing his total disability. It held, however, that "[t]he commissioner's inquiry . . . as to whether the plaintiff was realistically employable should not have ended with his review . . . of the plaintiff's physical capabilities. Under the facts of this case, the commissioner's decision necessarily involved his consideration of the . . . four vocational reports" as part of his decision as to whether the claimant proved his entitlement to temporary total disability benefits. Id., 681–82.

After reviewing the evidence presented to the commissioner, the court in *Bode* noted that none of the vocational experts had testified before the commissioner and that, of the four vocational reports, only the February, 2004 report unequivocally stated that the plaintiff presently was employable. Id., 682. Further,

the court in *Bode* noted that the November, 2003 and the July, 2008 vocational reports had been authored by the same evaluator, who had changed his opinion in his 2008 report by finding that the claimant, at that time, was " 'totally unemployable.' " Id., 684. Last, the court noted that the commissioner's decision discussed only the vocational reports suggesting that the plaintiff was employable, but made no finding as to the reliability of the August, 2004 or July, 2008 reports that had stated that the plaintiff was unemployable. Id., 684.

In reversing the decision of the board, the court in *Bode* "declined to afford deference to the commissioner's credibility determinations when such determinations were based solely on documentary evidence, noting that 'no testimony regarding any of the underlying assertions was taken. All of the facts . . . were reflected in the medical reports from the physicians . . . . Thus, the deference [that] we normally would give to the commissioner on issues of credibility is not warranted in the present case, because we are as able as he was to gauge the reliability of those documents.' " Id., 685, quoting *Pietraroia* v. *Northeast Utilities*, 254 Conn. 60, 75, 756 A.2d 845 (2000).

In the present case, the plaintiff argues, pursuant to *Bode*, that this court should decline to give deference to the commissioner's credibility determinations because here, as in *Bode*, none of the medical examiners testified before the commissioner, and thus this court is assertedly no less capable than the commissioner of deciding what weight to give to those reports. We disagree. Our conclusion rests on the fact that the commissioner's credibility determinations and findings in the present case were clearly influenced by the plaintiff's live testimony that he never engaged in weightlifting or other forms of physical exercise. As discussed in the preceding paragraphs, the plaintiff was questioned as to whether he had ever lifted weights, requested a medical release from O'Holleran to resume weightlifting, or had conversations at work about doing pushups and sit-ups every day before going to work. The plaintiff flatly denied these allegations. His testimony was directly contradicted, however, both by O'Holleran's medical notes and by the statements of his former coworkers. In his decision, the commissioner expressly found that there was "[c]onflicting testimony . . . between the [plaintiff] and [O'Holleran] as to the [plaintiff's] weightlifting activities and performing pushups"; that Selden "disagreed with the [plaintiff's] mechanism of the injury"; and that "the opinions and conclusions of [Selden are] more persuasive in part than those of . . . O'Holleran and Barnett on the issues of extent of disability and need for further medical treatment."

Against this background, we conclude that here, unlike in *Bode,* the commissioner was presented with " '[live] testimony regarding . . . the [claimant's]

underlying assertions' "; *Bode* v. *Connecticut Mason Contractors, The Learning Corridor*, supra, 130 Conn. App. 685; not just written reports from nontestifying experts, upon which to make his findings and conclusions. It is well settled that "[the] authority to find the facts entitles the commissioner to determine the weight of the evidence presented and the credibility of the testimony offered by lay and expert witnesses." (Internal quotation marks omitted.) *Ryker* v. *Bethany*, 97 Conn. App. 304, 314, 904 A.2d 1227, cert. denied, 280 Conn. 932, 909 A.2d 958 (2006). Moreover, "[e]ven if the medical evidence . . . is not refuted, the [commissioner] can still dismiss the claim if [he] does not find the injured worker to be credible." 3 A. Sevarino, Connecticut Workers' Compensation After Reforms (J. Passaretti, Jr., ed., 6th Ed. 2014) § 6.02.3, p. 760. Under the circumstances of this case, we see no compelling reason to give less deference to the commissioner's findings than we usually give to such findings in similar cases.[14]

## II

The plaintiff's final claim is that the board erred in not remanding the case to the commissioner with instructions that the commissioner articulate why he disregarded the opinion of Barnett, the medical examiner he chose to examine the plaintiff. In support of this claim, the plaintiff argues that, although a commissioner may "[choose] not to adopt the diagnosis of the physician performing [the commissioner's] examination," the commissioner "should articulate the reasons behind his or her decision to disregard the examiner's report" because it "has long been the expectation within workers' compensation law . . . that the [commissioner's] examiner's opinion will provide strong guidance to the commissioner's ultimate decision." (Internal quotation marks omitted.) The plaintiff asserts that the commissioner's decision in this case "summarily states the opinions and conclusions of [Selden]" without including "any explanation whatsoever for this departure," and thus the board erred in not remanding this case to the commissioner for further articulation. We disagree.

The following facts are pertinent to this claim. In his decision, the commissioner found, inter alia, that (1) Selden "opined in pertinent part that the [plaintiff] may have sustained a strain to his left shoulder"; (2) "Dr. Barnett opined, in relevant part, causally relating the present injury to the April 15, 2013 work-related incident, did not recommend surgical intervention . . . and recommended the [plaintiff] undergo a neurologic assessment"; and that (3) "the opinions and conclusions of [Selden are] more persuasive in part than those of . . . O'Holleran and Barnett on the issues of extent of disability and need for further medical treatment." On those grounds, the commissioner agreed with Selden that the plaintiff's April 15, 2013 injury "was self-limiting in nature . . . any restrictions or limitations on his

ability to work were unrelated to the April 15, 2013 injury . . . [and that] no further medical treatment is required as it relates to the April 15, 2013 injury."

In affirming that decision, the board held, in part, that it "reviewed the finding [and] award and [identified] no legal error." The board further held that "the text of the finding [and] award complies with the standard we have delineated for a decision which does not rely on the opinion of the commissioner's examiner." After reviewing the contents of the commissioner's decision, the board concluded that the reasoning for the commissioner's departure from Barnett's medical opinion "is clearly ascertainable in this opinion."

When reviewing the decision of the board, "[t]he role of this court is to determine whether the . . . [board's] decision results from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Tartaglino* v. *Dept. of Correction*, 55 Conn. App. 190, 193, 737 A.2d 993, cert. denied, 251 Conn. 929, 742 A.2d 364 (1999). "[T]he discretion [to remand the case] is a legal discretion vested in the [board]," and thus we review that decision to determine "whether the [board's] failure to remand the case to the commissioner constituted an abuse of its discretion . . . ." (Internal quotation marks omitted.) *Matey* v. *Estate of Dember*, 256 Conn. 456, 489, 774 A.2d 113 (2001).

It is well settled that "when a commissioner orders a medical examination, there is usually an expectation among the parties that said examination will provide strong guidance to the commissioner. Where a commissioner chooses not to adopt the diagnosis of the physician performing that examination, he or she should articulate the reasons behind his or her decision to disregard the examiner's report. . . . [A]lthough a commissioner should articulate the reasons behind his decision to disregard a § 31-294f examiner's opinion, the ultimate decision is always with the commissioner . . . ." (Citations omitted; internal quotation marks omitted.) *Gillis* v. *White Oak Corp.*, 49 Conn. App. 630, 636–37, 716 A.2d 115, cert. denied, 247 Conn. 919, 722 A.2d 806 (1998).

In concluding that the commissioner's decision "complied with the standard . . . delineated for a decision which does not rely on the opinion of the commissioner's examiner," the board was necessarily guided by § 31-310-3 of the Regulations of Connecticut State Agencies,[15] which governs the requisite content of a commissioner's decision. After interpreting the mandates of that rule, the board concluded that the commissioner's decision in this case satisfied those requirements. It is well settled that "[an appellate] court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the stat-

ute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Internal quotation marks omitted.) *Bailey* v. *State*, 65 Conn. App. 592, 602–603, 783 A.2d 491 (2001); see also *Bode* v. *Connecticut Mason Contractors, The Learning Corridor*, supra, 130 Conn. App. 679 ("[i]t is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board" [internal quotation marks omitted]).

In light of the foregoing case law and principles, which afford considerable deference to the board's interpretation and construction of its own regulations; see, e.g., *Bailey* v. *State*, supra, 65 Conn. App. 602–603; we conclude that the board did not abuse its discretion in not remanding the commissioner's decision for further articulation.

The decision of the Workers' Compensation Review Board is affirmed.

In this opinion the other judges concurred.

[1] The record before this court does not contain any reference to Dr. Ergin's first name.

[2] O'Holleran later explained that this second surgery was performed to cut away portions of residual scar tissue in the plaintiff's shoulder, thereby reducing stiffness and increasing the range of motion in the left shoulder.

[3] Peerless Insurance Company, the workers' compensation insurer for Edson Manufacturing, is also a defendant in this case. For convenience, we refer in this opinion to Edson Manufacturing as the defendant. See *Sellers* v. *Sellers Garage, Inc.*, 155 Conn. App. 635, 636 n.1, 110 A.3d 521 (2015).

[4] During the formal hearing before the commissioner, the plaintiff agreed with his counsel's statements that the dolly he used was a "vertical piece of metal with a flat bottom" with two wheels in the back, and that, to operate the dolly, the operator would place an item on the flat bottom, pull the item back toward the vertical piece of metal, and rest the weight of the item on the dolly's wheels.

[5] General Statutes § 31-294c (a) provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident . . . which caused the personal injury . . . . Notice of claim for compensation may be given to the employer or any commissioner and shall state, in simple language, the date and place of the accident and the nature of the injury resulting from the accident . . . . An employee of the state shall send a copy of the notice to the Commissioner of Administrative Services. . . ."

[6] General Statutes § 31-294f (a) provides in relevant part: "An injured employee shall submit himself to examination by a reputable practicing physician or surgeon, at any time while claiming or receiving compensation, upon the reasonable request of the employer or at the direction of the commissioner. The examination shall be performed to determine the nature of the injury and the incapacity resulting from the injury. The physician or surgeon shall be selected by the employer from an approved list of physicians and surgeons prepared by the chairman of the Workers' Compensation Commission and shall be paid by the employer. . . . The refusal of an injured employee to submit himself to a reasonable examination under this section shall suspend his right to compensation during such refusal."

[7] During his deposition, O'Holleran testified that a Bankart lesion "is a tear of the labrum [the cartilage that surrounds the socket in the shoulder] off of the glenoid in . . . [the] socket." He further testified that a bony Bankart lesion is caused "by the shoulder sliding out of [the] joint either partially, which is a subluxation, or fully, which is a dislocation," which results in "an avulsion of the labrum where it takes off a fleck of bone with it."

[8] Dr. Steven E. Selden testified that "[a] Hill-Sachs lesion is a depression in the humeral head that is a result of dislocations of your shoulder, where

the ball and socket come apart."

[9] O'Holleran described bone marrow edema as "fluid [in the bone] from an injury . . . that goes away a few months after the injury." He further testified that, because edema typically subsides after six months, the presence of edema in the plaintiff's shoulder indicated that the plaintiff's injury was new and unrelated either to the 2009 or 2012 surgery.

[10] At the outset of Selden's deposition, the following colloquy occurred:

"Q. You physically examined [the plaintiff], correct?

"A. That is correct as well.

"Q. You issued a report . . . and that's the full report, is it not?

"A. Correct.

"Q. Since that time, just recently, you have been given a couple of additional medical records from the past, which you did not have, correct?

"A. That is correct."

Neither the plaintiff nor the defendant inquired as to which additional medical records Selden had received and reviewed prior to his December 2, 2013 deposition.

[11] Subluxation is the medical term for a partial dislocation of the joint, "where the shoulder goes partly out of place."

[12] Notably, Selden's written addendum, much like his deposition testimony, does not state with any degree of specificity what additional medical records he reviewed between his December 2, 2013 deposition and his July 14, 2014 addendum to his written report. See footnote 10 of this opinion.

[13] Pursuant to § 31-301-8 of the Regulations of Connecticut State Agencies, the board "considers no evidence other than that certified to it by the commissioner, and then for the limited purpose of determining . . . whether there was *any evidence* to support in law the conclusion reached. It cannot review the conclusions of the commissioner when these depend upon the weight of the evidence and the credibility of witnesses. . . ." (Emphasis added.)

[14] Since the *Bode* decision, the board has held: "We do not believe *Bode* . . . has limited such precedents as [*O'Reilly* v. *General Dynamics Corp.*, supra, 52 Conn. App. 813] as to the trial commissioner's prerogative to assess and weigh medical evidence. A trial commissioner is not obligated to accept the most recent medical opinion presented to the tribunal. . . . However, when a medical witness offers subsequent testimony which deviates from a prior opinion, a trial commissioner must acknowledge and reconcile the differing opinions and should the commissioner seek to rely on the prior opinion, grounds for the reliance must be provided." (Citation omitted.) *Sullins* v. *United Parcel Service, Inc.*, No. 5611, CRB 1-10-12, 2012 WL 979543, *3 n.2 (January 6, 2012), rev'd on other grounds, 146 Conn. App. 154, 77 A.3d 196 (2013), aff'd, 315 Conn. 543, 108 A.3d 1110 (2015).

[15] Section 31-301-3 of the Regulations of Connecticut State Agencies provides: "The finding of the commissioner should contain only the ultimate relevant and material facts essential to the case in hand and found by him, together with a statement of his conclusions and the claims of law made by the parties. It should not contain excerpts from evidence or merely evidential facts, nor the reasons for his conclusions. The opinions, beliefs, reasons and argument of the commissioner should be expressed in the memorandum of decision, if any be filed, so far as they may be helpful in the decision of the case."

———————————————————